**BETHLEHEM STEEL CORPORATION,**
**Petitioner,**

v.

**The UNITED STATES ENVIRONMEN-**
**TAL PROTECTION AGENCY,**
**Respondent.**

No. 79–2382.

United States Court of Appeals,
Seventh Circuit.

Argued June 12, 1980.
Decided Dec. 22, 1980.

Bryan G. Tabler, Indianapolis, Ind., for petitioner.

Jane A. Axelrad, U. S. Environmental Protection Agency, Washington, D. C., for respondent.

Before PELL and BAUER, Circuit Judges, and CROWLEY, District Judge.*

PELL, Circuit Judge.

Bethlehem Steel Corporation (Bethlehem) has petitioned this court to review an action taken by the United States Environmental Protection Agency (EPA or Agency) pursuant to § 113(d)(2) of the Clean Air Act, 42 U.S.C. § 7413(d)(2) (Supp.1977). The EPA's action disapproved the issuance of a Delayed Compliance Order (DCO) to Bethlehem by the Indiana Air Pollution Control Board (Board) under § 113(d)(1). The DCO allowed Bethlehem an extended period of time greater than it would otherwise have been allowed to comply with the Indiana State Implementation Plan (SIP). EPA approval of the DCO was required by § 113(d)(2). The EPA Administrator finally disapproved the DCO for a variety of reasons on September 17, 1979, and Bethlehem

has appealed that disapproval pursuant to § 307(b), 42 U.S.C. § 7607(b).

I

FACTS

Although some of the characterizations of the factual occurrences that eventually led to this petition for review are the subjects of substantial disagreement between the parties, the occurrences themselves are not in significant dispute.

Bethlehem owns and operates a steel mill in Burns Harbor, Porter County, Indiana. The mill contains two batteries of coke ovens, each battery containing 84 ovens. Coke oven operations include "charging" (dumping coal from a lorry car into the oven), "coking" (destructing distillation of the coal turning it into coke which is accomplished by heating the inside of the oven in an oxygen-free atmosphere to avoid combustion of the coal), and "pushing" (ramming the hot coke out of the oven into a quench car which conveys the coke to a quench tower for dousing with water). None of these operations normally results in combustion of the coal or coke; nevertheless, coke battery operations do result in the emission of particulate matter into the atmosphere.[1]

The Clean Air Act empowers the federal Government to establish nationwide primary and secondary ambient air quality standards designed to protect the public health and welfare. *Train v. Natural Resources Defense Council*, 421 U.S. 60, 65, 95 S.Ct. 1470, 1475, 43 L.Ed.2d 731 (1974). Under the Act as amended in 1970, these standards are to be set by the federal EPA but primary responsibility for establishing the necessary measures for achieving these standards is given to the states. 42 U.S.C. §§ 7401(a)(3), 7410(a). *Train v. Natural Resources Defense Council, supra* at 64, 95 S.Ct. at 1474. The Act requires the state to submit its SIP to the EPA Administrator,

---

* Judge John Powers Crowley of the United States District Court for the Northern District of Illinois is sitting by designation.

1. Whereas Bethlehem characterizes the quantity of these emissions as "some," the EPA contends the amounts emitted are better described as "massive."

for his approval, setting forth the means of "implementation, maintenance, and enforcement" of the standards. 42 U.S.C. § 7410(a). To be enforceable, the SIP must be found by the Administrator to meet the statutory criteria specified in §§ 110(a)(2)(A)–(K) of the Act. 42 U.S.C. §§ 7410(a)(2)(A)–(K). If the state's SIP is found not to meet the statutory criteria, the Administrator is empowered to promulgate substitutes for the defective or absent measures. 42 U.S.C. § 7410(c). The EPA is also empowered to enforce the SIP in certain circumstances although primary enforcement responsibility remains with the states. 42 U.S.C. §§ 7413(a), (b). The state may also submit revisions to its SIP pursuant to § 110(a)(3)(A) which also must be reviewed and approved by the Administrator for compliance with the same criteria the original Plan is required to meet. 42 U.S.C. § 7410(a)(3)(A). Lastly, the state may issue orders pursuant to § 113(d) delaying the dates regulated entities are required to comply with the SIP. 42 U.S.C. § 7413(d). These orders, such as the one at issue here, are also subject to EPA veto pursuant to the 1977 amendments to the Act, § 113(d)(2), 42 U.S.C. § 7413(d)(2).

In 1972, the state of Indiana submitted its SIP to the Administrator for his review and approval and the Plan was approved on May 31 of that year. Since that time, the state has regulated the steel industry, including the Bethlehem coke operations at Burns Harbor, pursuant to that Plan and its amendments.[2]

The 1972 SIP contained Indiana Air Pollution Control Regulation (APC–3) which was promulgated by the state on December 6, 1968 (1968 APC–3) and which prescribed limitations on visible emissions emitted by "combustion" operations.[3] On October 7, 1974, the state amended its Regulation APC–3 to include under its prescriptions "any" operation, clearly including the coke batteries, and on November 8, 1974, transmitted the revised version to the EPA Administrator for his approval. On October 28, 1975, the Administrator published his determination on the revision. In the Federal Register, the Agency noted its dissatisfaction with "several respects" of the 1974 APC–3, the "most significant" one being that which granted certain operations, including the coke batteries, a 15-minute exemption from compliance in each twenty-four hour period. The Administrator's published conclusions continued:

> ... For such sources [as the Bethlehem coke operations], at least, [1974] APC–3 would be ineffective and impractical as a surveillance technique.... Accordingly, [1974] APC–3 must be disapproved to the extent that the 15-minute exemption provision in section 1 fails to meet the requirements of [40 C.F.R.] §§ 551.13(e)(1) and 51.19(c).
>
> * * * * * *
>
> With the exception of the above noted disapproval actions ... the proposed revisions meet the substantive and procedural requirements of section 110....

40 Fed.Reg. 50032–33.

The Agency here claims that the above statement expressed partial approval of the 1874 revision of Indiana APC–3, that part being the 1974 version without the 15-minute exemption. The Agency concludes, therefore, that the 1974 version, minus the exemption, became an enforceable part of the Indiana SIP which governed the Bethlehem coke operations. Bethlehem, on the other hand, contends that the Agency has no statutory authority to issue "partial" approvals of state revisions of its SIP and claims that to allow such an approval here

---

2. The Plan was amended five times between its promulgation and the issuance of the DCO at issue here. These amendments operated as the DCO did in this case to extend the time Bethlehem was given to obtain compliance with the SIP. The first four amendments occurred prior to the 1977 amendments to the Clean Air Act, and thus were not required to be submitted to

the EPA Administrator for approval. The fifth amendment, effective in August of 1977, apparently was not submitted either, however.

3. It is, apparently, the subject of disagreement between the parties as to whether 1968 APC–3 was applicable to operations such as the coke batteries here.

would be to allow a federal revision of the state Plan without compliance with the procedures set forth in § 110. The company concludes, therefore, that the comments in the Federal Register must be interpreted to accomplish a disapproval of the 1974 revision as a whole, and, therefore, that the 1968 APC–3 remained the only enforceable regulation governing visible emissions. This dispute is important to the present case because one of the reasons the Administrator gave for his disapproval of the DCO here was that he interpreted the DCO to demand compliance with an APC–3 other than the one he contends was partially approved in 1974.

The DCO was issued by the Indiana Air Pollution Control Board on November 15, 1978. The Order stated that the Board's investigation disclosed "possible violations" by Bethlehem of the standards set forth in "Indiana Regulations APC–3 and APC–5," and granted Bethlehem an extension of time within which it was required to obtain compliance with the Regulations.[4] The Order provided in detail various interim time requirements Bethlehem was to meet, and required that Bethlehem's pushing and charging operations be brought into final and full compliance with the state SIP by July 1, 1979. The Indiana Board then notified the federal EPA of its intent to enforce the DCO, although the exact date and the sufficiency of the notice is open to dispute between the parties. Bethlehem claims that the Administrator was notified either by issuance of the Order by the Board on November 15, 1978, or by publication of the issuance in the *Gary Post Tribune* on October 18, 1978. The Agency, on the other hand, contends that it did not receive adequate notice of the Board's action until December 26, 1978. The parties contend that the correct date is important here for two reasons. First, Bethlehem correctly points out that § 113(d)(2) of the Act requires the Administrator to issue his approval or disapproval of the DCO governing

a "major stationary source" (such as Bethlehem's coke operations) within 90 days "of receipt of notice of the issuance of [the DCO]." 42 U.S.C. § 7413(d)(2).[5] In this case, the Administrator failed to release his proposed disapproval until March 7, 1979, and failed to release his final disapproval until September 17, 1979. Bethlehem concludes, therefore, that the disapproval is voided by § 113(d)(2).

Second, § 113(d)(10) provides that during the period a DCO is "in effect" and the regulated operator is "in compliance" with the DCO, no federal enforcement action may be pursued. 42 U.S.C. § 7413(d)(10). As stated previously, the Indiana DCO was issued on November 15, 1978 and delayed the time Bethlehem was required to comply with the SIP until July 1, 1979. However, the EPA instituted an enforcement proceeding for the Bethlehem coke batteries' non-compliance with the SIP on December 21, 1978. *United States of America v. Bethlehem Steel Corporation*, No. H78–491. Bethlehem claims, therefore, that the action violated § 113(d)(10). The EPA, however, claims that because the DCO was not approved by the Administrator at the time the civil action was filed, the action was not instituted while the DCO was "in effect." In this argument, the Agency relies upon the provision in § 113(d)(2) that DCO's issued to "major stationary sources" are unenforceable until approved by the Administrator. 42 U.S.C. § 7413(d)(2). The Administrator concludes, therefore, that § 113 was not violated by the filing of the enforcement action. In addition, the Administrator contends that the filing of the civil action within 90 days after he admitted receiving notice of the DCO satisfied the "congressional purpose" of the 90-day limitation, and concludes that he also did not violate that provision.

The Administrator published his final disapproval of the Indiana DCO in the Federal Register on September 17, 1979, 44 Fed.

---

4. Due to the central place the DCO occupies in this case, it is reproduced in part as "Appendix A" to this opinion.

5. Bethlehem concedes that its coke operations are "major stationary sources" as used in § 113(d)(2).

Reg. 53746–48. In his opinion, which is reproduced as "Appendix B" to this opinion, the Administrator principally relied upon six deficiencies he found in the state Order. These deficiencies were as follows:

(1) Paragraph 10 of the Findings in the State Order states that there is no currently available control technology guaranteed to bring coke batteries into compliance—but that the Order was a "best effort" program. This is contrary to the U.S. EPA's position that controls exist that can attain compliance and it undercuts the reasonableness and enforceability of the Order.

(2) Paragraph 2 of the Order states that notwithstanding paragraph 1 (requirement for compliance), Bethlehem may challenge the applicability and technical feasibility of APC–3 and APC–5, should it fail to comply with the regulations. This means that Bethlehem agrees to install equipment, but if it fails to comply with the regulations, it may challenge the regulations. This equates to no *real* agreement or Order to comply with the regulations.

(3) Paragraph 8 contains a clause which states that if there is a delay in meeting interim or final dates for pushing controls (and compliance) which is "not within the reasonable control of" Bethlehem, then the Board agrees not to impose or seek criminal or civil penalties. The Board also agrees not to seek criminal penalties for delay (from such events) in meeting the final date for charging controls (and compliance), and no civil or criminal penalties for delays beyond the interim charging program dates. These provisions amount to agreements not to enforce violations of the Order.

(4) U.S. EPA is not satisfied that the program to control stack emissions is sufficient to attain compliance.

(5) The State Order addresses each operation (push, charge, etc.) separately. Regulation APC–5 considers the entire coke battery to be a single "process." In addressing the operations separately, there is *no* requirement for compliance at the stacks, standpipes, doors, etc.

(6) In addition, visible emissions Regulation APC–3 cited in the State Order is not the APC–3 which constitutes a part of the applicable State Implementation Plan (SIP). This is the result of EPA's disapproval of the 15-minute exemption contained in the State's submittal (40 FR 50032, October 18, 1975). Consequently, an approval of this Order would constitute approval of compliance with a requirement less stringent than the applicable SIP and is not authorized by Section 113(d)(1) of the Act.

The correctness of the Administrator's disapproval based upon these objections is, of course, the central dispute between the parties. In addition to this direct challenge to the Administrator's decision and the contentions regarding the 90-day limitation and the validity of the civil action, however, Bethlehem also attacks the procedure utilized by the EPA when reviewing the state Order. This attack is based on the fact that the EPA attorneys who were principally in charge of the enforcement action against Bethlehem were the same attorneys principally involved with reviewing the DCO issued to Bethlehem while that enforcement action was pending. Bethlehem contends that this commingling of functions not only resulted in an unfair determination of the DCO, but that the attorneys purposely delayed the consideration of the DCO to enhance their position in the ongoing litigation. Bethlehem concludes that the commingling and resulting Agency behavior not only violated the Administrative Procedure Act provisions requiring impartial and fair agency determinations, 5 U.S.C. §§ 554, 556, 557, but also violated similar requirements of the due process clause.

II

THE ADEQUACY OF THE RECORD

Initially, we must resolve Bethlehem's accusations that the EPA wrongfully withheld certain relevant documents from the record in this case despite this court's earlier order that the "whole record" be filed, and that remand to the Agency is therefore

required. The documents basically consist of internal EPA memoranda and were eventually turned over to Bethlehem pursuant to a Freedom of Information Act request.[6] EPA continues to contend, however, that these documents are not appropriately included in the record in this case because they allegedly did not form a basis of the Administrator's disapproval of the DCO. *See Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). We reject the Agency's narrow construction of this court's power to order supplementation of the record and hereby order the inclusion into the record of the documents already turned over to Bethlehem.

■ It is clear that this court has the legal authority and power to order the supplementation of the record where "anything material to any party is omitted from the record," Fed.R.App.Pro. 16(b), or where the supplementation is necessary for effective judicial review of the agency's actions. *U. S. Lines v. Federal Maritime Commission*, 584 F.2d 519 (D.C.Cir.1978), *Bunker Hill Co. v. EPA*, 572 F.2d 1286 (9th Cir. 1976), *Home Box Office v. FCC*, 567 F.2d 9 (D.C.Cir. 1977), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89. Were Bethlehem solely challenging the merits of the Agency's decision, the EPA suggestion that only evidence that was considered by the Administrator has a place in the record might have greater applicability. However, this is not such a case. Here, Bethlehem is not only challenging the merits of the Administrator's disapproval, but also contends that Agency personnel improperly commingled adjudicative and prosecutorial functions and relied upon improper *ex parte* communications in arriving at the decision to disapprove the DCO. These accusations make relevant and material the documentation of communications and memoranda revealing internal agency procedures.

We fully subscribe to what was stated in *National Courier Association v. Board of Governors of Federal Reserve System*, 516 F.2d 1229 (D.C.Cir.1975), where the Government also took the position that certain internal agency memoranda were not a proper part of the record because they were not expressly relied upon by the agency when reaching the challenged position:

> We think a fuller analysis is called for. Private parties and reviewing courts alike have a strong interest in fully knowing the basis and circumstances of an agency's decision. The process by which the decision has been reached is often mysterious enough without the agency maintaining unnecessary secrecy. To be sure, the agency may have a strong interest of its own in keeping internal documents from public view, but it will normally be far easier for the agency to establish its interest in suppressing such documents than for private litigants to establish their interest in exposing them to judicial scrutiny. The proper approach, therefore, would appear to be to consider any document that might have influenced the agency's decision to be "evidence" within the statutory definition, but subject to any privilege that the agency properly claims as protecting its interest in nondisclosure.

*Id.* at 1241.

■ Insofar as the Agency has released these documents to Bethlehem, we hold that the documents presented to this court by the Agency in response to this court's order that the "whole record" be filed should be included in the public record for review by us except for the single paragraph not released to Bethlehem and which was submitted to this court for *in camera* inspection. Upon such review, it is clear that the information contained in the paragraph is not necessary to this decision and thus the issues concerning its release would

---

6. EPA continues to withhold from Bethlehem one paragraph of one requested document, claiming exception from the operation of the Freedom of Information Act. This withheld paragraph is the subject of an appeal within the Agency by Bethlehem pursuant to estab-

lished FOIA procedures and was submitted to the court for *in camera* review in this case. In light of the submission to this court and the ongoing FOIA appeal, we need not decide the merits of the Agency's claim regarding the applicability of the exception.

be more appropriately addressed in the ongoing FOIA proceeding within the Agency. In light of our holding on this matter, a remand on this issue is not required.

### III

### THE REQUIREMENT OF AGENCY ACTION WITHIN 90 DAYS

■ We next turn to Bethlehem's contention that the Administrator's disapproval of the DCO was unlawfully delayed and unreasonably withheld because it was not issued within the 90 day period prescribed by § 113(d)(2). Although it is unclear what result such a finding would require (the Agency claims Bethlehem seeks an impermissible automatic approval of the DCO due to the delay, whereas Bethlehem claims it desires only the "enforcement of the statute as written"), we believe it is important to set forth our view that the Agency clearly violated the letter and intent of § 113(d)(2) in delaying its final disapproval for almost 10 months after it admits receiving notice of the state action, and at least 2 months after the DCO itself required final compliance.

To reach this conclusion, we need look no further than the position of the Agency and the explicit language of § 113(d)(2). The Agency's position was clearly set forth in its *Memorandum In Opposition To Bethlehem's Motion To Remand For Filing Of The Whole Record.* There, the Agency stated that

> EPA has not argued that it disapproved the DCO within ninety days. Instead, the Agency has asserted that filing of the enforcement action and later publication of the proposed disapproval of the DCO put Petitioner on notice that EPA intended to disapprove the order and fulfilled the purpose and intent of the section.

The language of § 113(d)(2), however, defeats the Administrator's interpretation. That section does not provide, as the Agency would suggest, that the Administrator shall *indicate* whether or not he *proposes* to approve or disapprove the state Order. Nor does it allow the Administrator to take the action of *his* choice which he feels will communicate his discontent to the interested parties. Rather, that section clearly states:

> The Administrator *shall determine*, not later than 90 days after receipt of notice of the issuance of [the DCO] with respect to any major stationary source, whether or not the [DCO] is in accordance with the requirements of this section. (Emphasis supplied.)

This statement immediately follows a provision stating that DCO's regarding major stationary sources shall not be effective until approved by the Administrator, whereas DCO's regarding non-major stationary sources are effective upon issuance by the state unless disapproved by the federal Agency. 42 U.S.C. § 7413(d)(2). The language and organization of the statute clearly require *enforceable* and therefore final action by the Administrator with respect to major stationary source DCO's within 90 days in return for the non-enforceability of the DCO prior to the Administrator's action. *See generally Rowell v. Andrus,* 631 F.2d 699 (10th Cir., 1980). Nothing has been offered by the Agency supporting a contrary conclusion.[7]

Not only does the Administrator's construction lack support in the statutory language, it also manifests poor policy considerations. Were the Agency's construction adopted, it would allow the Administrator an indefinite period of time finally to decide whether to approve the DCO as long as he indicated *some* predisposition within 90 days of his receipt of notice of the state's action. This clearly would violate the intent of § 113(d)(2). We have little doubt that the Agency would refuse to let sources such as Bethlehem have the benefits of a DCO prior to final approval by the Agency; yet the Agency seeks here to deny these

---

7. The record, in fact, contains a letter from John McGuire, Regional Administrator of the EPA, to Ralph Pickard, Technical Secretary of the Indiana Board, notifying the Board of the proposed publication of the EPA's final disapproval of the DCO, and stating: "Upon such publication, the order will be disapproved pursuant to Section 113(d) of the Clean Air Act."

benefits indefinitely. It is not difficult to posit a case where even the Agency's *approval* of a DCO was delayed so long that the source was subjected to great and possibly insurmountable difficulties in meeting requirements that even the Administrator agrees "border on the impossible." *Indiana & Michigan Electric Co. v. EPA*, 509 F.2d 839, 845 (7th Cir. 1978). In other cases, the Agency might delay its action sufficiently to moot the state action if, as was done in this case, the Administrator withheld his final action until after the compliance date set forth in the DCO. Moreover, the question remains as to what would be the proper result if the Agency changed its proposed resolution after it received comments from interested parties. The problems arising from the Administrator's construction persuasively argue against its adoption.

In short, we reject the Administrator's argument regarding the proper construction of § 113(d)(2). As the Administrator relies upon his construction and does not contend that he acted finally within the 90-day limitation, we need not resolve the contention between the parties regarding the exact date that the Administrator actually received notice of the state Board's action. That is an issue preferably left for resolution in the enforcement proceeding. However, we do note that substantial questions exist affecting the Agency's claim that the 90-day limitation did not begin to run until the DCO was "formally submitted" to the Agency on December 26, 1978. The first of these questions is based upon the language of § 113(d)(2) which requires agency action within 90 days "after receipt of notice" of the issuance of the DCO, and nowhere requires a formal submission.[8] Furthermore, the record reveals that even though the Agency claims that the DCO was not received by it until December 26, 1978, the state order had been

reviewed by Agency personnel prior to that time. For example, the record contains an undated EPA memorandum that "*following* U.S. EPA review of [the DCO] which the agency found to be unsatisfactory, a civil action was filed on December 21, 1978," five days prior to the time the agency admits receiving the notice. The record also contains a memorandum dated December 26, 1978, from M. G. Smith, the lead EPA enforcement attorney involved in the enforcement action against Bethlehem, to James McDonald, the Director of the EPA Enforcement Division, discussing in detail (and in terms remarkably similar to that used in the Agency's ultimate disapproval of the DCO) the Indiana Order and recommending disapproval. The concurrence of the date of this memorandum with the alleged date of the receipt of the state order either implies the work of a rather remarkably gifted staff attorney, an inadequate review of the DCO, or the receipt of the DCO prior to December 26. It certainly raises sufficient questions regarding the date of the Agency's receipt of notice of the DCO's issuance to deserve a more thorough examination on remand or in an enforcement proceeding.

As stated previously, what consequences follow from the Agency's recalcitrance is unclear but is a question that does not require a definitive answer here. Even if the Agency is correct in its interpretation that the only remedy available to Bethlehem is an action to compel agency action under either the Administrative Procedure Act, 5 U.S.C. § 706, or the Mandamus Act, 28 U.S.C. § 1361, it is clear from the position taken by the Agency here that the resulting action would be a duplicative rejection of the state Order. Under such circumstances, we shall review the merits of the Agency's disapproval.[9]

8. We wish to stress that we are not prospectively ruling upon an agency regulation requiring "formal submissions" prior to agency review. In this case, the Agency review clearly began prior to the alleged "submission" and to allow the Agency the benefit of an indeterminate review period prior to the time it decides

the 90-day clock should start running would defeat the intent of § 113(d)(2).

9. Bethlehem's argument that the filing of the civil action is illegal as a violation of § 113(d)(2)'s proscription of such actions while a valid DCO is "in effect" is an argument more appropriately made to the district court in that

## IV

## THE AGENCY'S DISAPPROVAL OF THE STATE DCO

(a) *The Standard of Review.*

█ Initially, we must decide the question of what standard the Administrator's action is required to meet. The parties have not directly addressed this question, nor does the statutory language resolve this issue. In some portions of its argument, Bethlehem contends that the Administrator's action is an "adjudication" as defined in the Administrative Procedure Act, presumably requiring the application of the "substantial evidence" rule. On the other hand, in other portions of its argument the Company attacks the Agency decision as "exceeding [its] authority," "arbitrary," and "clear error." Section 113(d), being a relatively new addition to the Clean Air Act, has not yet been the subject of judicial decision with respect to this specific issue. However, in light of the holdings regarding the standard of review imposed under analogous sections of the Act, we feel that the Administrator's decision to approve or disapprove a state DCO should be vacated only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See generally Getty Oil Co. v. Ruckelshaus*, 342 F.Supp. 1006 (D.Del.1972), *remanded on other grounds*, 467 F.2d 349 (3d Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973).

We agree with Bethlehem that the Administrator's action on a DCO has many of the manifestations of an adjudication. For example, the action applies solely to one entity and, at least in this case, looks only retro- and not prospectively. However, Bethlehem cannot escape the fact that § 113(d)(2), unlike many other provisions of § 113, fails to require a federal public hear-

ing prior to the Administrator's acting. *Compare* 42 U.S.C. §§ 7413(d)(9)(B), 7413(d)(1)(A). The language of 5 U.S.C. § 554, therefore, renders that section inapplicable.

Viewing judicial interpretations of related sections for guidance, we turn to §§ 110(a)(2) and (3) which governs SIP's and revisions to SIP's and which utilizes language similar to that used in § 113(d) to grant review authority to the Administrator. Section 110(a) provides:

> (2) The Administrator shall ... approve or disapprove such [SIP] or each portion thereof. The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that— [there follows a list of criteria]
>
> (3)(A) The Administrator shall approve any revision of an implementation plan applicable to an air quality control region if he determines that it meets the requirements of paragraph (2) and has been adopted by the state after reasonable notice and public hearings,

whereas § 113(d)(2) states:

> ... The Administrator shall determine, not later than 90 days after receipt of notice of the issuance of [a DCO] ... whether or not [the DCO] is in accordance with the requirements of this chapter.

Not only is the language similar, but, like the state variance procedures reviewed in *Train v. Natural Resources Defense Council, supra*, the DCO operates, in effect, as a revision of the state SIP compliance date with regard to a specific source. Section 113(d) was, in fact, enacted, in part, to remedy the problems Congress saw in the liberality in which these variances were being granted by the states. *See* H.Rep. 294, 95th Cong., 1st Sess. at 56. Given this similarity of language, purpose, and effect,

proceeding. It would seem that a civil enforcement action filed against a major stationary source within 90 days of the EPA's receipt of notice of the issuance of the DCO would not be expressly barred by § 113(d)(2). However, the filing of such an action prior to the issuance of a disapproval by the Administrator would seem

undesirable for it would open up many questions concerning the continued viability of the action if, for example, the DCO is later approved by the Agency, or, as in this case, the Agency fails to decide finally the issue within the 90-day period.

we think § 113(d) should be subject to the same standard of review as action under § 110. This standard is the "arbitrary, capricious, abuse of discretion or otherwise not in accordance with law" standard set forth in 5 U.S.C. § 706(2)(A). *Northern Ohio Lung Ass'n v. EPA*, 572 F.2d 1143, 1149 (6th Cir. 1978), and see *National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688 (2d Cir. 1975). We, therefore, adopt that standard here and shall apply it to the Administrator's decision under review.

(b) Administrator's Basis for Rejection: *The DCO statement that there is no currently available control technology guaranteed to bring the coke batteries into compliance is contrary to the U.S. EPA's position that controls exist and undercuts enforceability.*

(c) Administrator's Basis for Rejection: *U.S. EPA is not satisfied that the program to control stack emissions is sufficient to attain compliance.*

These two objections of the Administrator are treated under a single heading here because they both suffer from the same deficiency: they fail to explain adequately the Administrator's objection so as to allow corrective action by Bethlehem or judicial review by this court.

■ Even under the relatively liberal standard of review we apply in this case, the Administrator is not excused from his obligation

to publish a statement of reasons that will be sufficiently detailed to permit judicial review, *Automotive Parts & Accessories Ass'n v. Boyde*, 132 U.S.App.D.C. 200, 407 F.2d 330, 338 (D.C.Cir.1968), and even under the "arbitrary, capricious" standard agency action will not be upheld where inadequacy of explanation frustrates review. *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1972).

*National Nutritional Foods Ass'n v. Weinberger, supra* at 701. Thus, if the requirements of due process are to be met and adequate judicial review is to be obtained,

the agency must provide a written decision that clearly sets out the grounds which form the basis of its action. *Jarecha v. Immigration & Naturalization Service*, 417 F.2d 220, 225 (5th Cir. 1969). Secrecy, whether intentional or otherwise, is inconsistent "with fundamental notions of fairness implicit in due process and with the ideals of reasoned decision making on the merits which undergirds all our administrative law." *Home Box Office v. FCC*, 567 F.2d 9, 56 (D.C.Cir.1977), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89. The record or agency decision must demonstrate and reflect the exercise by the Administrator of "reasoned discretion" and not simply manifest a "crystal ball inquiry." *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1306 (9th Cir. 1977), *accord, U. S. Lines v. Federal Maritime Commission*, 584 F.2d 519, 533 (D.C.Cir.1978). The Administrator's published decision in this case regarding his rejection of the DCO on these two grounds clearly fails these tests.

Regarding the EPA's "position" disagreeing with the state's finding that technological controls do not exist, we join in Bethlehem's uncertainty as to the basis, substance, or legal effect of this "position." The Administrator has not referred this court to any order, rule or other policy statement setting forth this position or revealing the grounds or evidence upon which this position rests. Thus, even though the Agency may not be bound by the factual determinations made by the state that certain requirements are not technologically feasible, *Kennecott Copper Corp., Nevada Mines v. Costle*, 572 F.2d 1349 (9th Cir. 1978), its rejection of the state order must still not be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Bunker Hill Co., supra*. Without a decision or record more detailed than the one offered here, it is impossible for this court adequately to review the Agency's conclusions for arbitrariness. This basis for the Administrator's action, therefore, is rejected.

The second stated reason supporting the Administrator's decision is even a more

glaring example of an inadequate explanation. Regardless of the adequacy of an unknown basis for the Agency's action, [c]ourts require that administrative agencies "articulate the criteria" employed in reaching their result and are no longer content with bare administrative *ipse dixit* based upon supposed administrative expertise. *Appalachian Power Co. v. EPA*, 477 F.2d 495, 507 (4th Cir. 1973), *Environmental Defense Fund v. Ruckelshaus*, 439 F.2d 584, 598 (D.C.Cir.1973). The Agency's summary explanation that it is "not satisfied" with portions of the DCO simply will not be accepted.

(d) Administrator's Basis for Rejection: *The fact that the DCO allows Bethlehem to challenge the technological feasibility of the SIP's requirements in an enforcement proceeding fails to require compliance.*

We need not labor long to reject this basis of the Administrator's decision because the case law and fundamental notions of fairness reject the Agency's requiring the waiver of this defense as a precondition to the approval of a DCO.

■ As stated previously, it is now becoming established that even though the EPA is not free to disapprove a state SIP on the grounds that its requirements are not technologically feasible, *Union Electric Co. v. EPA*, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976), *Indiana & Michigan Electric & Co., supra*, it may disapprove a *revision of*, or a *variance from* the SIP granted by the state on the grounds that the SIP requirements are infeasible. *Kennecott Copper, supra, Bunker Hill, supra.* However, because these procedures may result in the state's requiring technological innovations that are infeasible or "border on the impossible," *Indiana & Michigan Electric Co., supra* at 845, these cases recognize that the source may raise its infeasibility defense in the course of enforcement proceedings. This is true whether the proceedings are brought in the state courts by the state, *Union Electric, supra* 427 U.S. at 266–67, 96 S.Ct. at 2529–30, or in a federal enforcement action under § 113. *Indiana &*

*Michigan Electric Co., supra* at 844. The statute nowhere makes the waiver of the defense a requirement for DCO approval. In light of these considerations, the Administrator's attempt to "backdoor" his way into obtaining this waiver by finding "unenforceable" a DCO which does not provide the waiver must be rejected as not being in accordance with law.

(e) Administrator's Basis for Rejection: *The Indiana Board's waiver of its right to seek certain civil and criminal enforcement penalties if Bethlehem's noncompliance with the SIP is due to factors "not within the reasonable control of Bethlehem" amounts to an agreement not to enforce the requirements of the Order.*

Section 113(d)(1), which sets forth the statutory requirements for an enforceable DCO, provides that such an order must contain a "schedule and timetable" for compliance. 42 U.S.C. § 7413(a)(1). "Schedule and timetable for compliance" is defined by § 302(p) of the Act as a "schedule of required measures including an enforceable sequence of action or operations leading to compliance...." 42 U.S.C. § 7602(p). The Administrator's position regarding this basis for his disapproval is that the state's waiver of its "most effective" enforcement tools renders the order unenforceable. We must reject this basis of the Administrator's decision as being beyond his statutory authority.

The Act does, in fact, require the Administrator to decide whether the DCO is "enforceable." However, if the Order is enforceable, the Administrator has little discretion but to grant his approval (assuming the other requirements of the statute are met). The Act does not provide, for example, that the Administrator may reject the DCO because it is not enforceable through a means he prefers, without some showing that the provided means were inadequate to obtain enforcement. This is, however, what the Administrator has attempted to find in this case, without making the required showing.

■ It is clear that this DCO is, in fact, enforceable notwithstanding the Board's waiver of certain civil and criminal enforcement powers. The Board's waiver is only effective if after a hearing before it, it finds that the non-compliance was due to factors beyond the control of Bethlehem. Even if this finding is made, however, the Board may still seek the non-compliance penalties provided in § 120 of the Act under the express terms of the Order. Furthermore, the Administrator himself may seek civil and criminal penalties pursuant to §§ 113(a), (b), or (c) and would not seem to be bound by the state's waiver. Lastly, other state agencies, including the Indiana Environmental Management Board, are conceded by Bethlehem to be able to seek all civil and criminal enforcement penalties. Ind.Code § 13–7–11–1–5, 13–7–13–1, and 13–7–13–3 (1976). The Administrator has not alleged or shown that these enforcement tools were inadequate.

■ In short, even though the Administrator may have preferred to have had the state retain the enforcement tools that were waived, there appears to be no statutory bar to the waiver as long as the Order remains "enforceable." The Act's provisions exhibit a desire to allow *the state* to "select whatever mix of control devices it desires," *Union Electric Co., supra* 427 U.S. at 266, 96 S.Ct. at 2529, *citing Train v. Natural Resources Defense Council., supra* 421 U.S. at 79, 95 S.Ct. at 1481. Primary responsibility for establishing the necessary measures for achieving the ambient air quality standards was given to the states. The role of the EPA is a secondary one, especially in decisions involving the equivalent of prosecutorial discretion. *Ohio Environmental Council v. EPA*, 593 F.2d 24, 29 (6th Cir. 1979). By second-guessing the state's chosen mix of enforcement tools, the Administrator has attempted to take the primary role away from the state. This was an abuse of his discretion.

(f) Administrator's Basis for Rejection: *The DCO's addressing each operation (push, charge, etc.) separately and not as a single "process" results in no requirement for compliance of the unaddressed elements, e. g., stacks, standpipes, doors, etc.*

■ The Administrator expanded on this basis for his rejection of the DCO in the text of his opinion which stated:

... the order is disapproved of not because each battery operation is addressed separately, but because certain pollutant-emitting operations whose control is critical to compliance were not addressed, e. g., doors, standpipes and combustion stacks....

Bethlehem's contention, which has gone unchallenged, and even unmentioned, by the Agency, is that the fact that the DCO did not address these operations means either that these operations were not in violation of the SIP's requirements at the time the DCO was issued, or that the state Board did not find that imposing new requirements on these operations was necessary to bring the batteries as a whole into compliance. We believe these arguments are persuasive absent some contrary position by the agency.

It is first to be noted that the unmentioned operations were addressed in and subject to certain (though not, necessarily, adequate) provisions of the original SIP as well as to provisions of Bethlehem's Operations and Maintenance Practices Program. For example, Bethlehem was required by the SIP to "operate and maintain such emission controls on each battery so that visible process, or combustion stacks, emissions shall not exceed...," and maintain "automatic door and jamb cleaners to ensure clean surfaces and promote maximum sealing efficiency to minimize leakage of smoke." *Order of the Air Pollution Control Board of the State of Indiana,* ¶ 1 and finding 3(c), March 29, 1973. Furthermore, the Order provides:

Nothing herein contained shall in any way affect the Board's rights to enforce air pollution regulations which deal with processes not covered by this Order.

*Id.* at ¶ 6.

Similarly, the Bethlehem *Program* contains provisions governing chuck doors, heat

stacks, standpipes and standpipe caps, and an entire section devoted to the proper provision and maintenance of various types of doors. In light of these provisions, the Administrator's complaint regarding the adequacy of provisions governing the omitted processes would seem wrongly aimed at the DCO and would seem more applicable to the original SIP.

The DCO, as stated previously, is simply an amendatory order extending the time in which the *operations it covers* are allowed to obtain compliance with the preexisting SIP. Its purpose is not to impose new restrictions or correct inadequacies in the original SIP. Rather, as § 113(d) expressly states, it simply governs operations that were unable to comply with the *existing* requirements. 42 U.S.C. § 7413(d). Assuming, therefore, that the SIP contained provisions governing the unmentioned operations, the fact that the DCO did not mention them results in their being subject to the pre-existing provisions of the SIP which presumably required compliance at an earlier date than that set forth in the DCO. If Bethlehem was unable to comply with those SIP requirements or if Bethlehem failed to meet the requirements of the DCO because of its failure to attend to these "critical" unmentioned operations, the Administrator's argument could be raised in a resulting enforcement action. If, on the other hand, sufficient SIP requirements governing these operations had not been provided, the Administrator's recourse would be to engage the proper procedure to have them promulgated. Rejecting the DCO is not such a procedure. We, therefore, must reject this basis of the Administrator's decision.

(g) Administrator's Basis for Rejection: *The Regulation APC–3 cited in the state order is not the APC–3 which constitutes a part of the SIP. Consequently, approval of the DCO would constitute approval of a less stringent APC–3 than provided in the SIP.*

 The parties take sharply contrasting positions with regard to this basis, neither of which can be accepted on this record.

As stated previously, Bethlehem basically contends that the Administrator lacks the power to approve partially and disapprove partially a state's submitted SIP revisions, and that the Administrator's 1974 action regarding Indiana APC–3 therefore operated as a rejection of the 1974 version as a whole. Bethlehem concludes, therefore, that the only enforceable version of APC–3 was that approved in 1968. The Administrator, on the other hand, contends that he does have the authority partially to approve state submissions and that he did so in this case with regard to the 1974 APC–3. He claims that the DCO incorporated the 1974 version *without* excising the 15-minute exemption, and, therefore, that the DCO incorporated an unapproved regulation, and therefore must be rejected. The difficulty with these respective positions is that even if we were to agree that the Administrator indeed has the authority to approve revisions partially, the record utterly fails to support that he in fact did so in this case. Furthermore, even if it had been established that he did so, the record fails to establish that the state did in fact apply the wrong APC–3 in the DCO.

Looking first to the language of the Administrator's 1974 decision on the submitted APC–3, we are offered little assistance. On one hand, we are informed that the "most significant" of "several" deficiencies the Administrator found in the revision was the inclusion of the 15-minute exemption, that the APC would be, therefore, "ineffective and impractical as a surveillance technique," and that the revision must be "disapproved to the extent that the 15-minute provision ... fails to meet the requirements" of the ambient air quality standards. On the other hand, the last paragraph provides that "with the exception of the above noted disapproval actions ... the proposed revisions meet the substantive and procedural requirements of section 110...." Given this language, it is not difficult to understand the parties' disagreement over exactly what the Administrator did.

The parties' subsequent behavior offers slightly more assistance, and at least indicates that they believed that the 1974 APC–3 was at least partially approved. For example, the DCO states that it was being entered into because Bethlehem's coke plants "were unable to immediately comply with the requirements of APC–3 and APC–5." If the 1968 version of APC–3, which Bethlehem has argued did not govern coke battery operations, was the regulation to which reference was being made, little necessity existed for Bethlehem and the state to enter into the DCO agreement. If the DCO were suddenly applying a broader version of APC–3 than provided in the SIP, it would seem that Bethlehem would have objected. This behavior raises a question regarding Bethlehem's contention that the State of Indiana meant to apply the 1968 version of APC–3 in the DCO.

Moreover, even if the 1974 APC–3 was properly approved in part by the Administrator or was intended to be applied by the state and Bethlehem, the record fails to support the Administrator's conclusion that the state meant to apply the 1974 version which included the 15-minute exemption. Not only has the Agency failed to refer this court to any support in the record suggesting that the 15-minute exemption was being utilized by the state or Bethlehem, but recent EPA actions further undercut this contention. For example, at the same time the Administrator was disapproving the Bethlehem DCO which referred only to "Indiana APC–3," he approved another Indiana DCO issued to Guardian-Industries, Inc. of Huntington, Indiana, which also referred only to "Indiana Regulations APC–3 and APC–5." 44 Fed.Reg. 15493–94 (March 14, 1979). Similarly, a few months earlier, on October 27, 1978, the Administrator published his own proposal to issue a federal DCO to Knauf Fiber Glass, GmbH of Shelbyville, Indiana, in which he stated that both "Indiana Air Pollution Control Regulations APC–3 and APC–5 ... are part of the federally approved State Implementation Plan." 43 Fed.Reg. 50224 (Oct. 27, 1978). There has been no evidence presented to

this court distinguishing the "Indiana Regulation APC–3" used in these orders from that referred to in Bethlehem's order.

In short, the record is inadequate to allow this court effectively to review the Administrator's action. Without any input from the state Board, we are totally uninformed as to which APC–3 the state intended to apply to Bethlehem, or whether the APC–3 applied incorporated the 15-minute exemption. It would seem the state intended to apply the APC–3 the Administrator wishes enforced, yet he has baldly concluded otherwise. Without some support in the record, we cannot accept this as an adequate basis for the Administrator's decision.

V

## THE AGENCY'S INTERNAL PROCEDURES

█ Bethlehem also challenges the Administrator's disapproval on the basis that the attorneys principally in charge of reviewing and recommending a disposition of the DCO were the same attorneys who were in charge of the ongoing enforcement proceeding against Bethlehem. Bethlehem contends that this commingling of functions violated the Administrative Procedure Act and applicable provisions of due process. The Agency replies that the relevant sections of the APA, 5 U.S.C. §§ 553, 554 and 556, are inapplicable to the Administrator's action, and that the admitted commingling of functions did not violate due process. Though we shall assume that the APA provisions do not apply here, we believe substantial questions have been raised regarding the propriety and fairness of the Agency procedures, questions sufficient to require a remand independent of those reasons discussed previously.

As to the applicability of the APA, we believe the law is well established that §§ 554, 556 and 557 do not apply absent language in the substantive statute requiring a public hearing. The language of those sections clearly sets this out. It is equally clear that § 113(d) of the Clean Air Act does not require a public hearing. We

shall assume, therefore, that these APA provisions do not apply.

This does not end the inquiry, however, for the due process clause also requires fundamental fairness to be respected in agency proceedings.

> Concededly, a "fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 [75 S.Ct. 623, 625, 99 L.Ed. 942] (1955). This applies to administrative agencies which adjudicate as well as to courts. *Gibson v. Berryhill*, 411 U.S. 564, 579 [93 S.Ct. 1689, 1698, 36 L.Ed.2d 488] (1973). Not only is a biased decisionmaker constitutionally unacceptable, but "our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison, supra* [349 U.S.] at 136 [75 S.Ct. at 625]; *cf. Tumey v. Ohio*, 273 U.S. 510, 532 [47 S.Ct. 437, 444, 71 L.Ed. 749] (1927).

*Withrow v. Larkin*, 421 U.S. 35, 46–47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975).

> ... [I]t is desirable that an administrative hearing be clothed "not only with every element of fairness but with the very appearance of complete fairness."

*Simard v. Board of Ed. of Town of Groton*, 473 F.2d 988, 993 (2d Cir. 1973), *quoting Amos Treats & Co. v. SEC*, 306 F.2d 260, 267 (D.C.Cir.1962), *and see American Cyanamid Co. v. FTC*, 363 F.2d 757 (6th Cir. 1966) (concerning disqualification of biased decisionmaker).[10]

It is true that where a litigant seeks to disqualify the decisionmaker for bias, or where he contends that the simple combination of investigative and adjudicative functions in a single agency necessarily creates an unconstitutional risk of bias, he

> must overcome a presumption of honesty and integrity in those serving as adjudicators; and [he] must convince that, under rational appraisals of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individual poses such a risk of actual bias or prejudgment that

the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Withrow, supra* 421 U.S. at 47, 95 S.Ct. at 1464, *Martin-Trigona v. Underwood*, 529 F.2d 33, 37 (7th Cir. 1975). It is also true however that this presumption of regularity "is not to shield ... action from a thorough, probing, in-depth review." *U. S. Lines, supra* at 526, *quoting Citizens to Protect Overton Park, supra* 401 U.S. at 415, 91 S.Ct. at 823.

> [T]he court must examine the procedures employed by the agency in reaching its decision to ensure that these procedures comply with applicable statutory and constitutional requirements.

*U. S. Lines, supra* at 526, *citing Citizens to Protect Overton Park, supra* 401 U.S. at 417, 91 S.Ct. at 824. Furthermore, although the procedures normally used by the agency may not, as written, present constitutional infirmities, "we should be alert to the possibility of bias that may lurk in the way particular procedures actually work in practice." *Withrow, supra* 401 U.S. at 54, 95 S.Ct. at 1468.

> That the combination of investigative and adjudicative functions does not, without more, constitute a due process violation, does not, of course, preclude a court from determining from the special facts and circumstances presented in a case before it that the risk of unfairness is intolerably high.

*Id.* at 58, 95 S.Ct. at 1470.

Bethlehem's due process claim in this case is affected by the difficulty this court has encountered in obtaining Agency records. As stated in *Home Box Office, supra* at 54,

> Where, as here, the agency justifies its action by reference only to information in the public file while failing to disclose other relevant information that has been presented to it, a reviewing court cannot presume that the agency has acted properly.

---

**10.** Although these cases deal with the requirement of agency fairness in hearings, there can be little question that the due process clause also requires fairness to be respected even where Congress has not chosen to require a public hearing.

Moreover, the claim is further affected by the fact that not only is Bethlehem challenging the Agency's order regarding the DCO simply because of the commingling of functions of the EPA enforcement attorneys, but is also alleging that the Agency delayed and reached its decision on the DCO in an effort to improve its position in the on-going enforcement action. In light of these circumstances, we conclude that although the Agency does enjoy certain presumptions of regularity, there exist sufficient questions regarding the propriety of the Agency's procedures to require a remand.

Our holding is the result not only of the secrecy surrounding the Agency's procedures or of the inconsistencies in its arguments regarding the date it actually received "notice" of the issuance of the DCO, but also of other aspects including the fact that the language used in the Administrator's proposed and final disapprovals was substantially identical to the language used in a memorandum written by the lead EPA enforcement attorney. This would normally not raise difficulties except for the fact that the attorney was *at that time* engaged in the enforcement action against Bethlehem. Furthermore, the suggestion in the memorandum, which later became a basis of the Administrator's decision, that the state's waiver of some enforcement tools "might hinder Federal enforcement if approved" raises serious questions in light of the existing federal action. In addition, the Agency's attempt to require Bethlehem to waive various defenses it might have in the enforcement action in order to obtain an approval of the DCO is highly questionable in light of the pre-existing decisions in *Union Electric Co., supra*, and *Indiana & Michigan Electric, supra*. Moreover, we are also concerned with the communication between the enforcement attorneys and the Administrator's office after the time had passed for public comment, and, once again, after the enforcement action had been filed.

In short, although many of these practices may not raise significant problems in normal Agency operations, we believe they do raise significant questions here where enforcement attorneys with substantial and significant input into the Administrator's decision on the DCO were, at the relevant time, engaged in litigation with Bethlehem over the same issues.[11] These questions cast a shadow over, at least, the appearance of fairness in the Agency's review procedures utilized in this case. We, therefore, vacate the Agency's decision and remand this proceeding to the Agency for proceedings in accordance with the considerations mentioned.

### VACATED AND REMANDED.

### APPENDIX A

No. A-59

AIR POLLUTION CONTROL BOARD
OF THE STATE OF INDIANA,

*Plaintiff,*

*v.*

BETHLEHEM STEEL CORPORATION
BURNS HARBOR, INDIANA,

*Respondent.*

### FINDINGS OF FACT

1. That the Air Pollution Control Board of the State of Indiana ("the Board") is an agency of the State of Indiana duly empowered pursuant to IC 13–1–1–1 et seq., to act upon complaints of alleged air pollution brought by any person and to issue such orders with respect thereto as it deems proper.

2. That the Board has jurisdiction over both the subject matter and the parties to this action.

3. That pursuant to the provisions of IC 13–1–1 and IC 13–7–11–2, notice and service of same is hereby waived by Respondent.

---

11. This is not the more normal situation where Agency personnel become involved in enforcement proceedings after being involved in agency review procedures regarding the same facts and parties. In these situations, the presumption of regularity discussion in the text would have great applicability.

4. That Bethlehem Steel Corporation owns and operates a steel production facility in Burns Harbor, Indiana.

5. That as part of its steel production process, Respondent owns and operates two by-product coke oven batteries.

6. That notwithstanding the control systems presently installed and operating, the Board's investigation of the operation of the coke oven batteries discloses possible violations of the standards set forth in Indiana Regulations APC 3 and APC 5.

7. That on March 29, 1973, the Board adopted a valid Order between the Respondent and the Board. Said Order set forth dates for compliance with Indiana Regulations APC 3 and APC 5 by Respondent. On July 24, 1973; February 26, 1975; October 22, 1975; June 23, 1976; and August 24, 1977, Amendments No. 1, No. 2, No. 3, No. 4, and No. 5, respectively, to that Order were adopted by the Board, which Amendments amended and superseded certain dates for compliance by the dates outlined in said Amendments. That for purpose of clarity, the schedules for compliance are incorporated in their entirety, including both incremental dates that have passed and those yet to come.

8. That in order to comply with the Delayed Compliance Order requirements of the Clean Air Act as amended August 7, 1977, both the Respondent and the Board desire that these Findings of Fact and Recommended Order amend and supersede the Order adopted March 29, 1973, as amended, with respect to the pushing and charging emissions from Batteries No. 1 and No. 2 set forth herein.

9. That after a thorough investigation of all relevant facts, including public comment, the Board has determined that the Respondent is unable to immediately comply with the requirements of APC 3 and APC 5, where applicable, at the Burns Harbor Plant Coke Oven Batteries, and therefore, pursuant to Section 113(d) of the Federal Clean Air Act, issues this Delayed Compliance Order which:

(A) has been issued after notice to the public containing the contents of the proposed order and opportunity for public hearing;

(B) contains a schedule and timetable for compliance;

(C) requires compliance with applicable interim requirements and requires the emission monitoring and reporting by the source authorized to be required under Sections 110(a)(2)(F) and 114(a)(1) of the Federal Clean Air Act;

(D) provides for final compliance with the requirements of the applicable regulations as expeditiously as practicable, but in no event later than July 1, 1979; and,

(E) hereby notifies the Respondent that unless exempted under Section 120(a)(2)(B) or (C), of the Federal Clean Air Act, it will be required to pay a noncompliance penalty effective July 1, 1979, in the event Respondent fails to achieve final compliance by July 1, 1979.

10. That there is no readily available control technology or known operating technologies guaranteed to bring coke batteries into compliance with Indiana Regulations APC 3 and APC 5. The compliance program set forth in the following Order, however, represents the best efforts of the Board and the Respondent to devise a program to provide for achieving compliance with APC 3 and APC 5 by July 1, 1979.

11. That pursuant to Section 107 of the Federal Clean Air Act, as amended, the area in the vicinity of the Burns Harbor Plant has been recommended by the Board and designated by the United States Environmental Pro-

 tection Agency on March 3, 1978, as unclassifiable with respect to attainment of the National Ambient Air Quality Standard for particulate matter.

12. That on March 22, 1978, the Board approved for public hearing revised Regulation APC 3 regarding visible emissions and new Regulation APC 9 regarding coke oven emissions which, if promulgated as proposed, may alter the performance required to achieve compliance with State regulations at the coke oven batteries.

## RECOMMENDED ORDER

Now, therefore, based upon the above Findings of Fact and upon consent of the parties, it is hereby ORDERED, ADJUDGED AND DECREED as follows:

1. That Respondent, Bethlehem Steel Corporation, shall abate particulate emissions according to the following schedule which provides for compliance with Indiana Air Pollution Control Board Regulations APC 3 and APC 5 no later than July 1, 1979.

 A. Pushing Emissions

 1. Submit final plans for three enclosed coke guides, two quench cars, and two stationary gas cleaning systems with associated air pollution control equipment for Batteries No. 1 and No. 2 by October 31, 1976.

 2. Place purchase orders by November 30, 1976.

 3. Complete installation by November 30, 1978.

 4. Achieve compliance by February 15, 1979.

 B. Charging Emissions

 1. Submit program for modified stage charging by September 1, 1977.

 2. Commence issuance of purchase orders pursuant to preliminary engineering by October 31, 1977.

 3. Commence construction by April 1, 1978.

 4. Complete engineering by July 31, 1978.

 5. Complete construction by June 3, 1979.

 6. Achieve compliance by July 1, 1979.

2. That notwithstanding the provisions of paragraph 1 hereof, nothing herein shall be or shall be deemed to be a waiver of Respondent's right to challenge the applicability or technical feasibility of Indiana Air Pollution Control Board Regulations APC 3 and APC 5 in any action brought to enforce the terms and conditions of this Order, which action is based in whole or in part on a failure to achieve compliance with said Regulations, provided however, that this provision shall not excuse the Respondent from installing the control equipment committed to in paragraph 1 of this Order.

3. That in the interim and until the time that compliance with Indiana Regulation APC 3 and APC 5 is achieved, Respondent shall employ the Operation and Maintenance Practice Program attached to this Order as Exhibit I with respect to the pushing and charging emissions from Batteries No. 1 and No. 2. This is the best practicable system of emissions reduction for the interim period.

4. That beginning thirty (30) days after the date of this Order, quarterly progress reports shall be submitted by the Respondent to the Board. Respondent shall include in such reports emission monitoring data required by paragraph 5 of this Order.

5. Respondent shall monitor the pressure drop and water flow rate of the land-based scrubber on Coke Oven Batteries No. 1 and No. 2, and shall maintain such data at the office of the Environmental Control Department at Burns Harbor and make such data available for inspection

upon the request of a staff member of the Air Pollution Control Division.

6. That upon application of Respondent, the provisions of this Order and plans and schedules submitted and approved hereunder may be modified by the Board when air pollution control standards applicable to the by-product coke ovens are changed; provided, however, that this Order shall be construed to provide for final compliance with the requirements of the applicable regulations as expeditiously as practicable, but in no event later than July 1, 1979, or three years after the date for final compliance with such requirement specified in such regulations, whichever is later. Any order, decision or other action taken by the Board upon such application may be appealed to the courts of the State as provided by IC 4–22–1–1 et seq.

7. Failure of the Respondent to achieve final compliance with Indiana Regulations APC 3 and APC 5 by July 1, 1979, may subject Respondent to a claim for a noncompliance penalty in accordance with Section 120 of the Clean Air Act, 42 USC 7420 and any State Regulation that may be submitted to and approved by the Administrator in accordance with that Section. Notwithstanding the above, Respondent reserves the right to contest in any forum the application of such penalty for noncompliance to any source covered by this Order.

8. That should events occur which cause a delay in meeting any interim dates established in this Order and these events are entirely beyond the control of the Respondent, upon application of Respondent these dates may be modified by the Board. Any order, decision or other action taken by the Board upon such application may be appealed to the courts of the State as provided by IC 4–22–1–1 et seq.

Should the Air Pollution Control Board, after hearing, determine that a delay in meeting the requirements of Section 1(A) of this Order is due to events which are not within the reasonable control of the Respondent, the Air Pollution Control Board agrees not to impose or seek any civil or criminal penalties for any delay beyond either the interim dates set forth in this Order or the July 1, 1979, date established by the Clean Air Act, other than those provided for under Section 120 of the Clean Air Act. Should the Air Pollution Control Board after hearing determine that a delay in meeting the requirements of Section 1(B) of this Order is due to events which are not within the reasonable control of Respondent, the Air Pollution Control Board agrees not to impose or seek criminal penalties for delays beyond the July 1, 1979, date established by the Clean Air Act or civil or criminal penalties for any delays beyond any of the interim dates set forth in this Order, other than those provided for under Section 120 of the Clean Air Act or rules or regulations promulgated thereunder.

9. This Order shall terminate with respect to any of the operations referred to in Section 1(A) or 1(B) as of the date that emissions from such operations are in compliance.

10. That nothing herein contained shall in any way affect the Board's right to enforce Air Pollution regulations which deal with provisions not covered by this Order.

I have reviewed the above Findings of Fact and Recommended Order and hereby recommend that the Air Pollution Control Board adopt this as its Final Order.

Dated: 11–15–78

/s/ HARRY D. WILLIAMS, DIRECTOR
AIR POLLUTION CONTROL DIVISION

I am duly authorized to legally bind Bethlehem Steel Corporation in this matter, and I have received a copy of the above Recommended Order and agree to be bound by said Order when issued by the Board and hereby waive the notice required by Indiana Code 13–1–1 and 13–7–11–2.

Dated: November 13, 1978

/s/ C. R. Rough
BETHLEHEM STEEL
CORPORATION, by:

## APPENDIX B

### ENVIRONMENTAL PROTECTION AGENCY

40 CFR Part 60

[FRL 1305–7]

Delayed Compliance Order for
Bethlehem Steel Corp.

AGENCY: U.S. Environmental
Protection Agency.

ACTION: Final rule.

SUMMARY: By this rule, the Administrator of U.S. EPA disapproved a Delayed Compliance Order to Bethlehem Steel Corporation (Bethlehem). The Order requires the Company to bring air emissions from its coke oven batteries at Burns Harbor, Indiana, into compliance with Regulations APC–3 and APC–5 of the Indiana Air Pollution Control Board (Indiana APC–3 and APC–5). Because this Order is disapproved by U.S. EPA, Bethlehem's compliance with the Order will not preclude suits under the Federal enforcement and citizen suit provisions of the Clean Air Act (Act) for violations of the State Implementation Plan (SIP) regulations covered in the Order.

DATES: This rule takes effect September 17, 1979.

FOR FURTHER INFORMATION CONTACT: Ms. Louise C. Gross, Attorney, United States Environmental Protection Agency, Region V, 230 South Dearborn Street, Chicago, Illinois 60604, telephone (312) 353–2082.

SUPPLEMENTARY INFORMATION: On March 7, 1979 the Regional Administrator of U.S. EPA's Region V Office published in the Federal Register (44 FR 12461) a notice setting out the provisions of a proposed State Delayed Compliance Order for Bethlehem. The notice asked for public comments and offered the opportunity to request a public hearing on the proposed disapproval.

The Agency's proposed disapproval was based upon six separate factors. These were as follows:

(1) Paragraph 10 of the Findings in the State Order states that there is no currently available control technology guaranteed to bring coke batteries into compliance—but that the Order was a "best effort" program. This is contrary to the U.S. EPA's position that controls exist that can attain compliance and it undercuts the reasonableness and enforceability of the Order.

(2) Paragraph 2 of the Order states that notwithstanding paragraph 1 (requirement for compliance), Bethlehem may challenge the applicability and technical feasibility of APC–3 and APC–5, should it fail to comply with the regulations. This means that Bethlehem agrees to install equipment but if it fails to comply with the regulations, it may challenge the regulations. This equates to no *real* agreement or Order to comply with the regulations.

(3) Paragraph 8 contains a clause which states that if there is a delay in meeting interim or final dates for pushing controls (and compliance) which is "not within the reasonable control of" Bethlehem, then the Board agrees not to impose or seek criminal or civil penalties. The Board also agrees not to seek criminal penalties for delay (from such events) in meeting the final date for charging controls (and compliance), and no civil or criminal penalties for delays beyond the interim charging program dates. These provisions amount to agreements not to enforce violations of the Order.

(4) U.S. EPA is not satisfied that the program to control stack emissions is sufficient to attain compliance.

(5) The State Order addresses each operation (push, charge, etc.) separately. Regulation APC–5 considers the entire coke battery to be a single "process." In addressing

the operations separately, there is *no* requirement for compliance at the stacks, standpipes, doors, etc.

(6) In addition, visible emissions Regulation APC–3 cited in the State Order is not the APC–3 which constitutes a part of the applicable State Implementation Plan (SIP). This is the result of EPA's disapproval of the 15-minute exemption contained in the State's submittal (40 FR 50032, October 18, 1975). Consequently, an approval of this Order would constitute approval of compliance with a requirement less stringent than the applicable SIP and is not authorized by Section 113(d)(1) of the Act.

One letter of comment was received during the public comment period. This was from Bethlehem, the source involved in the State administrative order. Bethlehem's objections can be summarized as follows:

1. U.S. EPA failed to determine whether the State order was issued in accordance with Section 113(d) of the Act within the ninety-day period established by that Section.

2. The reasons for proposed disapproval set forth in the Federal Register do not address the appropriate statutory criteria.

3. U.S. EPA's interpretation of SIP Regulations APC–3 and APC–5 is erroneous.

4. U.S. EPA's reasons for the proposed disapproval are:

* * * in conflict with Section 113(d)(1)(C)–(D), the Indiana Implementation plan, the case of *Indiana & Michigan Electric Company v. EPA*, 509 F.2d 839 (7th Cir. 1975), other applicable decisions, and the Constitution insofar as they would require that Bethlehem agree to do the impossible, waive or be deprived of its rights to administrative and/or judicial hearings on pertinent issues, or be penalized for occurrences or failures beyond its control with or without hearing.

In issuing this final disapproval of the State order, the Agency has determined that its objections as set forth in the March 7, 1979 Federal Register generally remain valid. In addition, U.S. EPA has determined that Bethlehem's objections do not warrant a contrary position.

First, the fact that U.S. EPA did not publish this final disapproval within ninety days of the State order's passage is not a bar. Although the State apparently adopted the agreement as a final order on November 15, 1978, it was not submitted to U.S. EPA until December 26, 1978. Proposed disapproval on March 7, 1979 therefore occurred within the statutory ninety-day period.

In addition, a civil action was initiated by U.S. EPA under Section 113(b) of the Act against the Bethlehem Steel Corporation on December 20, 1978. This action is based, in part, upon violations of regulations APC–3 and APC–5 of the Indiana SIP by Bethlehem's coke batteries located in Burns Harbor, Indiana. Because the civil action addresses the facilities which are the subject of the Order under consideration, the filing of the action constituted a rejection of the Order issued by the Indiana Air Pollution Control Board and put both the State of Indiana and Bethlehem on adequate notice as to the Agency's position in this matter.

Second, EPA believes that the six bases outlined in its proposed disapproval remain valid for purposes of final disapproval. The only clarification the Agency's rationale for disapproval is with regard to paragraph 5. Thus, the Order is disapproved not because each battery operation is addressed separately, but because certain pollutant-emitting operations whose control is critical to compliance were not addressed, e. g., doors, standpipes and combustion stacks.

Section 113(d) requires U.S. EPA review of State orders to assure that they in fact provide for "final compliance with the requirement of the applicable implementation plan * * *" Section 113(d)(1)(D). Because of the six factors previously discussed, this statutory criterion is not met. In addition, Section 113(d)(1)(B) requires that a Delayed Compliance Order contain a " * * * schedule and timetable for compliance," which is defined in Section 302(b) as including an " * * * *enforceable* sequence of actions or operations leading to compliance * * *" (*emphasis added*). For the reasons previ-

ously enumerated, the Bethlehem Order is not an enforceable agreement.

Bethlehem also asserted that U.S. EPA's interpretation of the applicable regulations was erroneous. U.S. EPA continues to believe that its interpretation of Regulations APC–3 and APC–5 is proper. It should be noted that this issue has also been raised by Bethlehem in the Agency's civil action against this source.

With regard to Bethlehem's final comment, the U.S. EPA maintains that this disapproval is in accordance with the statutory scheme established by the Clean Air Act and applicable case law. Again, it is anticipated that such objections can be raised by Bethlehem in the pending civil action.

Therefore, the Delayed Compliance Order issued by the Indiana Air Pollution Control Board to Bethlehem is disapproved by the Administrator of U.S. EPA pursuant to the authority of Section 113(d)(2) of the Act, 42 U.S.C. § 7413(d)(2). Publication of this notice of final rulemaking constitutes final Agency action for the purposes of judicial review under Section 307(b) of the Act. (42 U.S.C. §§ 7413(d), 7601.)

Dated: September 10, 1979.

Douglas M. Costle,
*Administrator.*

1. In consideration of the foregoing, chapter 1 of Title 40 of the Code of Federal Regulations is amended as follows:

By adding an entry to the table in § 65.192 to read as follows:

§ 65.192 U.S. EPA disapproval of State Delayed Compliance Orders.

The State Order identified below has been disapproved by the Administrator in accordance with Section 113(d)(2) of the Act and with this part. With regard to this Order, the Administrator has determined that it does not satisfy the applicable requirements of Section 113(d) of the Act.