UNITED STATES of America, Plaintiff,

v.

BETHLEHEM STEEL CORPORATION, Defendant.

No. 2:90–CV–326–RL.

United States District Court,
N.D. Indiana,
Hammond Division.

Aug. 31, 1993.

Richard J. Clarizio, U.S. E.P.A., Office of Regional Counsel, Chicago, IL, Andrew B. Baker, Jr., John F. Hoehner, U.S. Attys. Office, Dyer, IN, Richard B. Stewart, John H. Grady, Kevin P. Holewinski, U.S. Dept. of Justice, Environmental Enforcement Section, Environment and Natural Resources Div., Deborah A. Kline, Elizabeth A. Ojala, U.S. E.P.A., Office of Enforcement, Washington, DC, Dorothy Attermeyer, Mary Fulghum, Catherine J. Garypie, U.S.E.P.A. Office of Regional Counsel, Thomas M. Giller, U.S. Dept. of Justice Environmental Enforcement Section, Chicago, for plaintiff.

Bryan G. Tabler, Donald E. Williams, Mark E. Shere, John M. Kyle, III, Barnes and Thornburg, Indianapolis, IN, J.B. Smith, Beckman Kelly and Smith, Hammond, IN, William H. Graham, Bethlehem Steel Corp., Bethlehem, PA, for defendant.

## MEMORANDUM OPINION AND ORDER

LOZANO, District Judge.

The Plaintiff, the United States ("United States") brought this action against Bethlehem Steel Corporation ("Bethlehem") alleg-

ing that Bethlehem violated the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.*, and the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f, *et seq.* In an order dated March 19, 1993, 829 F.Supp. 1023, this Court found that Bethlehem failed to perform the corrective action program required by two Underground Injection Control ("UIC") Permits that the Environmental Protection Agency (the "EPA") issued to Bethlehem. As to the United States' remaining five claims, the Court found that Bethlehem violated numerous RCRA requirements in its operation and management of three hazardous waste management units at its Burns Harbor facility ("the Facility"), i.e., a landfill and two terminal polishing lagoons. The Court granted the United States' request for injunctive relief and held a civil penalty hearing, which began on July 6, 1993, and concluded on July 21, 1993.[1] After hearing testimony and reviewing the parties' exhibits, this Court hereby issues the following findings of fact and conclusions of law.

*FINDINGS OF FACT*

*Bethlehem's Two Hazardous Waste Underground Injection Wells*

Bethlehem owns and operates two Class I underground injection wells at the Facility. Bethlehem started using these wells in 1968 and continues to use them to dispose of waste ammonia liquor generated at the Facility. The waste ammonia liquor disposed of in the injection wells is a characteristic hazardous waste within the meaning of Section 1004(5) of RCRA, 42 U.S.C. § 6903(5) and 40 C.F.R. § 261.32. In accordance with the requirements of Section 1421 of SDWA, 42 U.S.C. § 300h, and 40 C.F.R. Part 144, on September 30, 1985, the EPA issued to Bethlehem two UIC permits to operate the two underground injection wells. Each UIC permit authorizes Bethlehem to dispose of waste ammonia liquor into the wells in accordance with each permit and the UIC program.

On or about October 2, 1985, Bethlehem informed EPA's, Region V Technical Programs Branch that Bethlehem fully intended to comply with the Preliminary Assessment

requirements contained in Attachment F of Bethlehem's two UIC permits in accordance with the schedule specified in those permits. On November 15, 1985, Bethlehem filed an administrative appeal of the UIC permits.

On January 19, 1989, EPA rejected Bethlehem's appeal, and the permits became final agency action. Bethlehem then appealed EPA's decision to the Seventh Circuit Court of Appeals. The Seventh Circuit, which consolidated Bethlehem's appeal with a similar appeal by Inland Steel Company, rejected the steel companies' claims and upheld the validity of the UIC permits, including the corrective action requirements. *Inland Steel Co. v. EPA,* 901 F.2d 1419 (7th Cir.1990).

During the course of the appeal, Inland had asked the Seventh Circuit to stay the applicability of the permits pending judicial review, but the Seventh Circuit denied the motion. Bethlehem therefore, did not receive a stay of the permits. Bethlehem knew that absent a stay, it was required to comply with the terms of the permits. Since January 19, 1989, Bethlehem has been required to but has failed to comply with the corrective action requirements of its UIC permits according to the terms of its UIC permits. Bethlehem's two UIC permits required Bethlehem to submit to EPA the Preliminary Assessment Plan ("PSA") by February 27, 1989, and a Remedial Investigation ("RI") Report and Corrective Action Plan by July 19, 1989. Neither the PSA, the RI, nor the Corrective Action Plan were submitted by the required dates. As a result of Bethlehem's prolonged failure to comply with its UIC permits, on April 19, 1990, EPA notified Bethlehem and the State of Indiana that Bethlehem was in violation of the SDWA and RCRA, due to Bethlehem's failure to comply with Part I(J) and Part III(F) of its UIC Permits issued on September 30, 1985, and therefore, subject to civil penalties of $25,000 for each day of noncompliance.

The undisputed evidence shows that Bethlehem never attempted compliance prior to receiving the United States' Notice of Violation in April 1990. Further, Bethlehem did

---

1. The United States, in its enforcement discretion, is not seeking civil penalties for Bethle-

hem's violations which relate to the terminal polishing lagoons.

not commence making the PSA required by the UIC permits until July 16, 1990, and not until January 31, 1992, did it submit its final "DRAFT" report on the assessments for the Solid Waste Management Units ("SWMUs") it has identified to date. While EPA accepted Bethlehem's delayed submissions, it never agreed that its acceptance of those late submissions would serve to extend Bethlehem's time frame for compliance with its UIC permits. Bethlehem had since September 30, 1985, to either comply or initiate compliance with the permits. Instead, Bethlehem chose to not comply and appealed.

Bethlehem argues that it was impossible to adhere to the time schedule in the UIC permits. However, the evidence does not support Bethlehem's contention. Bethlehem employs more than 30,000 employees nationwide, and more than 6,000 work at its 3300 acre Burns Harbor Plant. Once it started to undertake work in July 1990, Bethlehem could have assigned additional employees to reduce by 40% the time it took to complete the PSA. On July 16, 1990, three months after the enforcement action was initiated, Bethlehem submitted documents to EPA, as part of the PSA, which were taken from existing file information. These documents were compiled in only eleven days. The compilation of *existing information* could have been submitted to EPA by the permit deadline of February 27, 1989. Even if these documents were not complete, Bethlehem could have shown its good faith by attempting to partially comply by the deadlines.

Many of Bethlehem's witnesses testified as to the impossibility of the corrective action schedules in the permits.[2] Bethlehem was provided with the opportunity to negotiate with EPA over the terms in the UIC permits, both before and after they were issued and Bethlehem knowingly accepted and endorsed the corrective action schedule in those permits. However, Bethlehem did a much more thorough assessment report than other permittees had done in the past. Further, the point is that Bethlehem never challenged the time frame for compliance on appeal, nor formally requested a modification pursuant to the terms of the permit.[3] Of seven other companies that were issued permits with the exact same schedule, one complied within the time frames in the permit and a total of five are now in compliance, some due to requests for permit modifications. Bethlehem could have submitted a proposed RI report and Corrective Action Plan to EPA by July 19, 1989.

Bethlehem's failure to comply with the corrective action schedules in the UIC permits EPA issued to Bethlehem was a result of Bethlehem's own willful actions and inactions. Those actions frustrated the purposes of RCRA and SDWA and adversely impacted the resources of EPA, which has been required to devote an inordinate amount of its resources to trying to obtain Bethlehem's compliance. At the same time, Bethlehem has had the substantial benefit of being able to inject millions of gallons of hazardous waste into the earth's surface rather than having to pay to ship the waste off-site. Due

2. Finally, notwithstanding Bethlehem's suggestion at the hearing in this case, on June 7, 1990, Dr. Leah Haworth, the permit writer for Bethlehem, did not agree that the time frames in Bethlehem's permits for the submission of the PSA and proposed Corrective Action Plan were impossible or unworkable for Bethlehem to comply with. The weight Defendant seeks to place on Defendant's Exhibit 107, a June 7, 1990 "Conversation Record" from Leah Haworth to Rebecca Harvey is, therefore, misplaced. In context, Dr. Haworth's statements in that "Conversation Record" as to the "workability" of Bethlehem's permits schedules, as explained in her declaration (Defendant's Exhibit 325), was not an opinion that the schedules contained in Bethlehem's existing permits could not be complied with but instead were in recognition "that, since Bethlehem had obviously not complied with the Corrective Action schedule in the existing permits and

could no longer do so since the dates were passed, any new permits (which the Agency was then planning to issue) would have to incorporate 'alternative' compliance dates, if they were to be workable in terms of current compliance." Thus, it seems plain that Dr. Haworth's statements contained in Defendant's Exhibit 107 do not support their assertion that the corrective action schedules in Bethlehem's permits were impossible to comply with.

3. Although Bethlehem did submit a written request to EPA for modification on May 2, 1990, this letter was not directed to the permit writer at the time, and in any event, this informal request cannot be substituted for following the correct regulatory procedure as outlined in the permits.

to Bethlehem's substantial noncompliance with its UIC permits, the EPA has not, under Agency policy, issued a new permit to Bethlehem.

There are 155 SWMUs at the Facility. Bethlehem's groundwater monitoring efforts at Burns Harbor are insufficient to determine whether there have been releases from all SWMUs. A total of 52 SWMUs at Burns Harbor, including the F006 landfill, and the riparian fill area located near Lake Michigan have been identified as having actual releases or potential releases of hazardous wastes or constituents into the environment. These releases pose a potential risk of harm to human health and the environment.

Based on the above, this Court finds that Bethlehem failed to substantially complete the PSA from February 27, 1989, until at least January 31, 1992, or 1,068 days. Bethlehem failed to submit the RI report and Corrective Action Plan, required under its permits, from at least July 19, 1989, to at least July 6, 1993, or for a total of 1,448 days. Accordingly, Bethlehem is potentially subject to civil penalties for at least 2,516 days for its violations of the terms and conditions of its UIC permits.

*Bethlehem's Hazardous Waste Landfill*

The hazardous constituents present in Bethlehem's wastewater treatment sludges from its tin and chromium electroplating operations (F006 hazardous waste) are hexavalent chromium, lead, cadmium, and nickel. F006 hazardous waste, such as that in the landfill at the Facility, poses a potential hazard to human health and the environment when improperly transported, treated, stored, disposed of or otherwise managed. Bethlehem petitioned EPA to delist its F006 hazardous waste on July 14, 1981.

On January 17, 1986, EPA proposed to deny Bethlehem's petition due to Bethlehem's own failure to submit complete information. On July 23, 1986, EPA proposed that Bethlehem's July 14, 1981, delisting petition be denied and that the temporary exclusion previously granted to Bethlehem be withdrawn. On November 7, 1986, EPA announced that it was denying Bethlehem's delisting petition due to the fact that Bethlehem had not demonstrated to EPA that the

wastes that were the subject of Bethlehem's petition were rendered nonhazardous by Bethlehem's treatment system. At that time, EPA also revoked Bethlehem's temporary exclusion.

On November 18, 1986, EPA notified Bethlehem that the effect of the Agency's November 7, 1986, action was that Bethlehem had to manage the wastes, that were the subject of its petition, as hazardous waste in accordance with 40 C.F.R. Parts 262–266 and Parts 70, 271, and 124. Prior to this though, Bethlehem knew as early as mid-January 1986, that EPA was planning to deny Bethlehem's delisting petition and revoke its temporary exclusion. By a letter dated September 30, 1986, and received by Bethlehem on October 6, 1986, EPA informed Bethlehem that whenever the temporary exclusion for its F006 hazardous waste in its landfill was lost, Bethlehem was obligated to manage that waste as hazardous. The September 30, 1986, letter was reviewed by at least four top management officials of Bethlehem. After receiving that letter and/or after communicating with Scott Maid of EPA by telephone in late September or early October 1986, Bethlehem did not inform EPA in writing that Bethlehem's understanding of its RCRA obligations for its F006 was different than the substantive RCRA obligations the September 30, 1986, letter from Scott Maid of EPA clearly spelled out. Subsequently, by a letter dated January 27, 1987, the Indiana Department of Environmental Management informed Bethlehem that it was required to comply with RCRA interim status standards applicable to its landfill. Any confusion as to the regulatory status of the landfill claimed by Bethlehem had to have been made crystal clear by EPA's letter of October 6, 1986, the publication in the Federal Register, and IDEM's letter of January 27, 1987.

On February 12, 1987, Bethlehem filed a petition for review of EPA's November 18, 1986, rulemaking with the United States Court of Appeals for the District of Columbia Circuit. On March 18, 1988, Bethlehem moved in the D.C. Circuit Court of Appeals that EPA's denial of Bethlehem's petition be remanded to the agency in light of the decision in *McLouth Steel Products Corp. v.*

*Thomas,* 838 F.2d 1317 (D.C.Cir.1988). On July 29, 1988, the U.S. Court of Appeals granted Bethlehem's motion to remand but denied its motion to vacate. On September 30, 1988, EPA withdrew its denial of Bethlehem's petition. EPA again informed Bethlehem at that time, however, that Bethlehem had to continue to treat its F006 waste as hazardous waste until such time as it may, in the future, be granted an exclusion by the agency of that waste. On September 19, 1990, and then again on October 21, 1992, EPA again proposed that Bethlehem's delisting petition be denied.

The Administrator of EPA found that F006 may pose a substantial present or potential hazard to human health and the environment when groundwater wells, such as the approximately 30 water supply wells identified near Bethlehem's landfill, become contaminated due to the improper management of F006. Bethlehem failed to have a groundwater monitoring system for its landfill that complies with RCRA regulations and also filtered their samples, which is not an acceptable technique under RCRA. Because of its noncompliance with RCRA standards, it is impossible to determine whether the groundwater and drinking supply wells have become contaminated, since Bethlehem's existing groundwater system cannot detect statistically significant amounts of hazardous waste or constituents that migrate from the waste management area to the upper most aquifer at the Facility.

Bethlehem's landfill does not have security measures in place such as 24 hour surveillance, barriers, or controlled entry to prohibit persons from entering into these area. In fact, both these areas are regularly accessed by persons. Furthermore, the area does not have danger signs posted at its entrance.

During visits to the Burns Harbor plant, Walter Francis of EPA has observed material being blown off the uncovered and unlined landfill by wind and air. Francis further testified that a ditch near the landfill has been sampled by EPA and the water from that ditch contained elevated levels of heavy metals and the sediment from that ditch contained elevated levels of heavy metals and semi-volatile organic constituents.

There is no question that Bethlehem has known since at least 1986 that once its temporary exclusion expired, it was required to comply with all applicable RCRA requirements for its landfill and lagoons. However, as this Court found on March 19, 1993, Bethlehem has completely failed to comply with the applicable RCRA requirements for these units. Moreover, as determined in its May 11, 1993, Memorandum Opinion and Order on Bethlehem's Motion to Rescind the Injunction and further demonstrated by the evidence presented at the penalty hearing in this case, Bethlehem's failure to comply with RCRA has been willful. Since at least October 1986, top-management at Bethlehem knew that once its temporary exclusion expired, Bethlehem was required to comply with RCRA. Instead, however, Bethlehem decided not to comply with RCRA. This finding is reinforced by the testimony of Mr. Boltz, Mr. Bays, and Mr. Lindgren, who each testified that they knew under RCRA, a generator of a listed hazardous waste, such as Bethlehem, is required to comply with RCRA until such waste is delisted. Bethlehem's waste has not and it does not appear that it will be delisted. Despite Bethlehem's understanding of the "logic of RCRA," Bethlehem ignored, at its peril, the clear RCRA regulatory requirements applicable to their landfill.

Concerning EPA's inaction on Bethlehem's delisting petition, this Court must find that a large part of the passage of time was not attributable to the EPA and is a result of a number of factors beyond the Agency's control, including: 1) the passage of the Hazardous and Solid Waste Amendments of 1984, which added additional criteria for the Agency to consider in reviewing delisting petitions; 2) Bethlehem's failure to supply the Agency with all the necessary information to assess Bethlehem's petition; 3) Bethlehem's admitted failure to have its laboratory conduct the proper tests; and 4) the fact that there had been litigation by Bethlehem (which lasted approximately 2 years) over the Agency's review of Bethlehem's petition. However, a significant portion of time must be attributable to EPA due to the slow grinding wheels of a bureaucracy.

Finally, Bethlehem offered no evidence at the hearing in this case to suggest that its violations of RCRA are a result of its reliance on the delisting process or EPA's actions with respect to any other facility.

Bethlehem has failed, since May 18, 1987, until at least July 6, 1993, to comply with the closure regulations found at 40 C.F.R. § 265.110–120 and of the Indiana Administrative Code ("IAC"), 329 IAC 3–20–1 to 3–20–5, for its landfill from May 18, 1987, until at least July 6, 1993, or for at least 2,240 days. Due to potential issues related to the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501, *et seq.*, the United States, as a matter of enforcement discretion, is not seeking civil penalties under this Count for violations of 40 C.F.R. §§ 265.112, 113, 118, and 119 from January 31, 1992 to March 29, 1992, and from September 1, 1988 to January 30, 1989, or for a total of 152 days. Therefore, the total number of days of violation for which Bethlehem is subject to penalty under the United States' Second Claim (Count II) for Relief is 2,088 days.

As to Count III, Bethlehem has failed, since May 18, 1987, until at least July 6, 1993, to comply with the groundwater monitoring requirements found at 40 C.F.R. § 265.90–94 and of 329 IAC 3–20–1 to 3–20–5 for a total of 2,240 days. Due to potential issues related to the PRA, the United States, as a matter of enforcement discretion, is not seeking civil penalties under this Count from October 1, 1991 to February 24, 1992, and from October 1, 1987 to November 3, 1987, for a total of 178 days. The total number of days of violation which Bethlehem's subject to penalty under Count III is 2,062 days.

Bethlehem has failed, since May 18, 1987 until at least July 6, 1993, to comply with the financial assurance and liability insurance requirements found at 40 C.F.R. §§ 265.143, 145, and 147, and of 329 IAC 3–22–4, 3–22–5 through 3–22–9, 3–22–13, 3–22–14, 3–22–24(a) & (b) from May 18, 1987 until at least July 6, 1993, or for a total of 2,240 days. Due to potential issues related to the PRA, the United States is not seeking civil penalties under this Count for Bethlehem's violations from October 1, 1991 to March 29, 1992, or for a total of 179 days. The total number of days

of violation for which Bethlehem is subject to penalty under Count IV is 2,231 days.

Bethlehem has failed to install a run-on control system, run-off management system or wind dispersal management system for its hazardous waste landfill as required by RCRA and 40 C.F.R. § 265.302 and of 329 IAC 3–28–3(a)–(d) from May 18, 1987, until at least July 6, 1993, or for a total of 2,240 days.

Bethlehem has failed from January 21, 1987 (and at least since March 21, 1988) until May 3, 1993, to submit part B of its RCRA permit application to the State of Indiana as required by 40 C.F.R. § 270–10, and the companion State of Indiana regulation at 329 IAC 3–34–1, for a total of 1,932 days. Due to potential issues related to the PRA, the United States, as a matter of enforcement discretion, is not seeking civil penalties under this Count for the time periods of October 1, 1991 to March 29, 1992; May 1, 1990 to July 1, 1990; and July 1, 1988 to August 7, 1988, or for a total of 279 days. The total number of days of violation for which Bethlehem is potentially subject to penalty under the United States' Sixth Claim (Count VI) for Relief is 1,653 days.

The total number of days for which Bethlehem has failed to comply with its UIC permits, SDWA, or RCRA is 13,408 days. Of those days, the United States asked this Court not to consider 845 days of violation due to the PRA. Bethlehem is subject to a penalty, pursuant to the provisions to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), not to exceed $25,000 per day for each day of violation for 12,563 days.

*Civil Penalty for Corrective Action Violations*

■ Pursuant to this Court's Memorandum Opinion and Order of March 19, 1993, Bethlehem is liable for civil penalties not to exceed $25,000 for each violation of its Underground Injection Control Permits.

Section 1423(a) and (b) of SDWA, 42 U.S.C. §§ 300h–2(a) and (b) provides that:

any person who violates any requirement of an applicable underground injection control program * * * shall be subject to a

civil penalty of not more than $25,000 for each day of such violation.

Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), provides that:

any person who violates any requirement of this subtitle shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of violation shall, for purposes of this subsection, constitute a separate violation.

The assessment of a civil penalty is committed to the informed discretion of the Court. *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 229 n. 6, 95 S.Ct. 926, 930 n. 6, 43 L.Ed.2d 148 (1975); *United States v. Crown Roll Leaf, Inc.*, 29 E.R.C. 2025, 2031, 1989 WL 201617 (D.N.J. 1989); *United States v. T & S Brass and Bronze Works, Inc.*, 681 F.Supp. 314, 322 (D.S.C.1988), *aff'd in part and vacated in part on other grounds*, 865 F.2d 1261 (4th Cir.1988); *United States v. Phelps Dodge Industries, Inc.*, 589 F.Supp. 1340, 1362 (S.D.N.Y.1984).

■ Although 42 U.S.C. § 6928(g) provides for assessment of civil penalties, the statute does not contain any guidance for this Court in determining penalties in a judicial proceeding. However, 42 U.S.C. § 6928(a)(3) provides factors that the Administrator of the EPA shall consider in fixing civil penalties in an administrative action. RCRA requires the Administrator to take into account the seriousness of the violation and any good faith efforts to comply with regulatory requirements. Thus, in the absence of any statutory guidance, this Court will apply these factors in determining an appropriate penalty. *See U.S. EPA v. Environmental Waste Control, Inc.*, 710 F.Supp. 1172, 1242 (N.D.Ind.1989). In this case, the Court will also consider the economic benefit derived by Bethlehem for failing to comply with environmental laws, the government's conduct, the clarity or ambiguity in the controlling law, and the prejudice to Bethlehem caused by EPA's delay. *See General Motors Corp. v. United States*, 496 U.S. 530, 541 n. 4, 110 S.Ct. 2528, 2534 n. 4, 110 L.Ed.2d 480 (1990) (government conduct); *Environmental Waste Control*, 710 F.Supp. at 1209, 1245

(regulatory clarity, economic benefit); *United States v. Production Plated Plastics, Inc.*, No. K87–138 CA, 1992 WL 397725 (W.D.Mich. Sept. 4, 1992) (seriousness of harm, economic benefit, and other factors).

■ Bethlehem argues that because EPA did not demonstrate that the environment or human health has been harmed by their failure to perform corrective action, their civil penalty should be mitigated. This Court does not disagree that the EPA has failed to show that the environment or human health has been harmed by any releases, specifically, releases as defined under the permits which violate EPA standards. In fact, samples taken from Bethlehem's wells were well below the limits for drinking water established by EPA. However, the problem with this argument is that while Bethlehem may have known that its releases were not hazardous, by not providing this information to EPA, the EPA and the public had no knowledge of whether its releases were, indeed, hazardous. Moreover, it appears that Bethlehem had such information due to its own testing from 1985 to 1989, and by objecting to the permits, did not provide the information to EPA. In fact, the information that Bethlehem has provided to EPA is questionable, as Bethlehem's monitoring wells do not comply with RCRA and the water samples that were tested were filtered. So EPA still does not have a complete picture about whether the releases from Bethlehem's wells were hazardous. This uncertainty must be attributable to Bethlehem, *Environmental Waste*, 710 F.Supp. at 1243, and accordingly, this Court finds Bethlehem's failure to comply with the conditions in its UIC permits a serious violation.

■ As to Bethlehem's good faith efforts in complying with the terms of the permits, it is clear from the record that Bethlehem made no effort to comply before or after their appeal was denied by the Seventh Circuit, and did not think about compliance until the Administrator brought an action against them in April of 1990. Further, once they made their mind up to attempt to comply, it only took them 11 days to provide EPA with their initial sets of documents on July 16,

1990. Although Bethlehem argues that it did do corrective action during this time period by installing groundwater monitoring wells, neither EPA nor the public benefited from their actions because Bethlehem's test results were not provided to EPA. Accordingly, this Court finds that Bethlehem is not entitled to any mitigation of penalty before the Administrator filed this action. However, once the Administrator filed this action, Bethlehem has tried to comply with the requirements under the permits, albeit under their own terms.

Bethlehem also argues that any penalty should be mitigated due to EPA's conduct regarding corrective action. This argument is based on mainly a memorandum from Leah Haworth, Ph.D. to Rebecca Strom Harvey in which Ms. Haworth stated, "Of course we realize the schedule in the permit is not workable. I said I really can't comment on that (but actually he is right—we'll have to work out an alternative and incorporate it into a new permit. I don't know what the UIC and RCRA attorneys will think)." The argument goes that because EPA knew the corrective action deadlines were unreasonable, Bethlehem should not be penalized. However, as stated earlier, it is this Court's opinion and as supported by her second supplemental affidavit, Ms. Haworth was referring to the fact that since the expiration date of the permits the time table for corrective action had passed under the permits, it was impossible for Bethlehem to comply with that time frame. Moreover, even assuming that the EPA knew the corrective action deadlines needed to be changed, it was incumbent upon Bethlehem to initiate a formal request for a modification of the permits in order to obtain relief from the current time schedule in the permits.

■ The Government's expert, Daniel Walter Francke, testified that Bethlehem would sustain a total economic benefit of $1.8 million for Bethlehem's failure to comply with corrective action requirements and the closure requirements of the landfill. The Court finds Mr. Francke's testimony to be credible, and in any event, with respect to corrective action, Bethlehem has put on no testimony from their own expert to the con-trary. Mr. Francke testified that $174,500 or approximately 10% of the $1.8 million of the economic benefit Bethlehem enjoyed is due to its failure to comply with corrective action requirements. Of this amount, Mr. Francke gave Bethlehem credit for spending $62,000 on corrective action up until February 1992. Bethlehem claims it has already spent over $500,000 on corrective action. However, this Court will not credit this amount for Bethlehem's efforts while it was not complying with the permits. Further, this Court has found that Bethlehem's groundwater monitoring wells do not comply with RCRA. As Bethlehem has failed to provide any information as to how and when its corrective action expenditures were made, and how this amount factors into an economic benefit or loss for Bethlehem, this Court can give it no weight in determining its penalty. Moreover, "[t]he cost of compliance with the law ... is not a proper set-off to apply to penalties for non-compliance." *Environmental Waste*, 710 F.Supp. at 1244.

The last matter to be considered by the Court is the financial status of Bethlehem, or Bethlehem's ability to pay a large penalty. Although Bethlehem did not have its financial officer testify, its economic expert testified that between 1988 and 1992, Bethlehem lost more than $1 billion, and that the financial health of the company is weak. However, on cross-examination the United States noted that between 1987 and 1992, they had two years in which they made a profit. Of the $2.5 million allocated to Bethlehem's environmental affairs budget, none was specifically allocated to the Burns Harbor facility. Because Bethlehem has made a profit in recent years, this Court finds that it is able to pay a substantial penalty, although it will not likely be able to pay the maximum penalty that is possible in this case. For its corrective actions violations, the total amount of penalty Bethlehem is subject to is $62,-900,000.

■ Although the government requests that this Court impose a per diem amount for each violation, this Court will not do so as it is within this Court's discretion to determine the total amount of penalty that Bethlehem deserves. However, the Court will consider

the total amount of days that Bethlehem is in violation. *See Environmental Waste,* 710 F.Supp. at 1242. Similarly, the Court will not begin with assuming a $25,000 per day fine and then work its way down based on Bethlehem's mitigating circumstances. *Id.* Instead, the Court will view the evidence in total to determine a single penalty. In doing so, the Court will keep in mind that the major purpose of a civil penalty is deterrence, *Id., United States v. Vineland Chemical Co.,* 20 E.L.R. 21398, 21402, 1990 WL 157509 (D.N.J.1990), *T & S Brass,* 681 F.Supp. at 322, and that even if an individual defendant is likely to repeat its violation, a substantial penalty is warranted to deter others. *Student Public Interest Research Group of New Jersey, Inc. v. AT & T Bell Laboratories,* 617 F.Supp. 1190, 1201 (D.N.J. 1985); *Phelps Dodge,* 589 F.Supp. at 1358. After considering Bethlehem's violation of its Corrective Action Permits and the mitigating circumstances relating thereto, the Court hereby assesses a civil penalty against Bethlehem in the amount of $4.2 million.

*Civil Penalty for Landfill Violations*

Bethlehem makes similar arguments with respect to its violations regarding the landfill. Bethlehem argues that the United States failed to show an environmental risk from the filtercake in the landfill. Bethlehem did parade a number of witnesses who stated their opinion that the filtercake is chemically incapable of posing a risk under the conditions at the Burns Harbor plant. (See testimony of Douglas Bley; D. George Bays; Richard Christensen) In particular, Mr. Bays testified that under the Synthetic Precipitation Leaching Procedure, or acid rain test, which is more stringent than the actual conditions at the Burns Harbor plant, the results indicated that releases occurred below EPA's drinking water standards, which are based on consumption of two liters of water everyday for 70 years. Moreover, Mr. Christensen, a former hydrogeologist, testified that water taken from groundwater monitoring wells and lysimeters inside and beneath the landfill meets EPA's drinking water standards. Mr. Christensen also testified that the direction of the groundwater flow at the landfill is to the south and that the soil beneath the entire south portion of the landfill consists of relatively impermeable clay, and that because of this clay, water moves through the landfill at a rate of only one foot per year. As the distance from the landfill to the Little Calumet River is more than 400 feet, it would take more than 400 years for any hazardous constituents to reach the river.

Mr. Bays testified that EPA developed an Oily Waste Extraction Procedure ("OWEP") that serves as an alternative to the Extraction Procedure Toxicity testing for the filtercake. He testified that the OWEP assumes the degradation of oil over time from a waste and that this has not occurred in the filtercake. Bays also testified that Bethlehem performed the OWEP test and found again that the results were more than an order of magnitude below the numeric thresholds that EPA has identified in its regulations for whether a material is hazardous, which the EP Tox test also showed.

■ Bethlehem also makes several arguments regarding the propriety of EPA's 1993 delisting comments to its petition. In sum, the point that Bethlehem strives to make is that the delisting office makes no claim of a risk being present from the filtercake under *the actual conditions* at the Burns Harbor plant. This statement is true. However, it is true because Bethlehem's

> ground-water monitoring system and associated data are inadequate for determining the impact of the petitioned waste on the ground water. The well system installed by [Bethlehem] has not been approved by EPA or State RCRA authorities, and does not appear to be in compliance with RCRA standards.... In addition to the deficiencies in the well system, ground-water samples were analyzed for only five constituents.... Other hazardous constituents may be present in the ground water and concentrations exceeding delisting health-based levels. The unidentified organic constituents in the waste raise EPA's concern over the very limited ground-water analysis performed. Moreover, ground-water samples were filtered in the field prior to analysis. The agency believes that filtering ground-water samples is not

in general an acceptable technique for delisting ... Therefore, EPA believes that the ground-water data do not support [Bethlehem's] contention that the waste has not contaminated the ground water underlying the petitioned waste.

(See Defendant's Exhibit 348, letter from Rick Brandes, EPA Chief Waste Identification Branch, to John Sapia, Superintendent, Environment Control Department, Bethlehem Steel Corporation, dated October 21, 1992). Since it appears that Bethlehem is at fault for not providing the EPA with a true picture of the potential hazardous nature of its landfills, it cannot then argue that its penalty be decreased due to lack of severity because the EPA has failed to prove that the filtercake in the landfill is hazardous. Moreover, this Court is in no position to second-guess EPA as to the reasons it feels that the landfill poses a threat to the environment or human health.

As to Bethlehem's argument that their penalty should be mitigated because of EPA's delay in ruling on their delisting petition, as stated earlier, in this Court's findings of fact, a large portion of that delay was due to matters not within the EPA's control, although some of the delay must be attributed to the EPA due to the time it has taken EPA to review Bethlehem's petition. But this Court cannot fault the EPA for failing to grant Bethlehem's delisting petition, which EPA thinks Bethlehem is not entitled to because its wastes remain hazardous. Furthermore, it was Bethlehem's duty to comply with the closure, groundwater monitoring, financial assurance and liability insurance, run on/run off control system requirements, and requirement to submit part B of its permit application to the State of Indiana from day one until EPA ruled on Bethlehem's petition.

And as to Bethlehem's argument that the penalty should be mitigated due to the closeness of the issue whether Bethlehem's F006 waste from electroplating operations was hazardous, the Court finds it of little merit. The only issue this Court believes is at all remotely close is whether Bethlehem's F006 waste is hazardous despite the invalidation of the mixture role. In any

event, this does not excuse Bethlehem's noncompliance from 1987 until the decision in *Shell Oil* in 1991. It may tend to mitigate Bethlehem's noncompliance after the *Shell Oil* decision, and the Court will take this into consideration.

Lastly, Bethlehem cries foul because of the contacts between the EPA's enforcement staff and the delisting contractor who was reviewing Bethlehem's petition. According to one contractor, Bethlehem had a "sensitive petition" that required the delisting office to "talk with ... lawyers, Region, and State" (*see* Bethlehem Exhibit 76) and that "we'll work with Region V on reg. status." (*Id.*) From this, Bethlehem infers that the delisting contractor is in cahoots with EPA's Region V office to decide the regulatory status of Bethlehem's filtercake. The memo does mention that it is a sensitive petition, but in the context that it was the fourth oldest petition pending, that they needed to prioritize it, and that the file is apparently small and mostly correspondence. Moreover, the fact that the delisting office was communicating with lawyers from the Region and State is not conclusive that there was any conspiracy against Bethlehem, but could merely mean that the delisting office needed to apprise these individuals as to the status of Bethlehem's petition. Bethlehem makes similar arguments regarding its exhibits 80, 81, 82, and 85, claiming that the contractors informed EPA that they must have some enforcement action regarding the landfill and lagoons. The Court cannot expect the delisting contractor to solely report to the delisting office. Surely, if a delisting contractor feels that a waste should not be delisted, then EPA's enforcement division should be apprised of that fact and then EPA could determine whether or not to bring an enforcement action.

Bethlehem also claims that EPA's enforcement lawyers have improperly contacted delisting contractors. (See Bethlehem Exhibits 89, 90, 91, and 92.) However, in this Court's slip opinion dated March 19, 1993, this Court has already found that the EPA has not engaged in affirmative misconduct. After reviewing the same arguments by Bethlehem and considering an affidavit of Robert H.

Kayser, Chief of the Delisting Section, who stated that, to the best of his knowledge, no enforcement lawyers employed by or on behalf of the EPA has suggested to him or anyone else that has been involved in working on Bethlehem's delisting petition that the review and consideration of said petition should be delayed or otherwise influenced by the lawsuit the United States has filed against Bethlehem.

Moreover, this Court is unsure that Bethlehem is entitled to raise a "commingling" defense to mitigate the penalties that are due to the United States. The Court does recognize that Bethlehem is entitled to an unbiased decision on its delisting petition. But, "where a litigant seeks to disqualify the decisionmaker for bias, or where he contends that the simple combination of investigative and adjudicative functions is a single agency necessarily creates an unconstitutional risk of bias, he"

> must overcome a presumption of honesty and integrity in those serving as adjudicators; and [he] must convince that, under rational appraisals of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individual poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Bethlehem Steel v. United States EPA,* 638 F.2d 994, 1009 (7th Cir.1980) (quoting *Winthrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975)). In *Bethlehem Steel,* Bethlehem challenged the EPA's disapproval of the issuance of a Delayed Compliance Order ("DCO") to Bethlehem by the Indiana Air Pollution Control Board. Bethlehem challenged the EPA's disapproval on the basis that "the attorneys principally in charge of reviewing and recommending a disposition of the DCO were the same attorneys who were in charge of the ongoing enforcement proceeding against Bethlehem." 638 F.2d at 1008. Noting that the combination of investigative and adjudicative functions does not, without more, con-

stitute a due process violation, the Seventh Circuit stated that it is not precluded from determining from the special facts and circumstances presented in a case before it that the risk of unfairness is intolerably high. *Id.* at 1009. While recognizing other agency irregularities,[4] the Court was most concerned with the fact that "enforcement attorneys with a substantial and significant input into the Administrator's decision on the DCO were, at the relevant time, engaged in litigation with Bethlehem over the same issues." *Id.* at 1010. Especially since "the language used in the Administrator's proposed and final disapprovals was substantially identical to the language used in a memorandum written by the lead EPA enforcement attorney." *Id.* See also *United States v. Hardage,* 663 F.Supp. 1280, 1290 (W.D.Okla.1987) (court condemned EPA for failing to comply with mandate of due process dictating separation of prosecutorial and decisionmaking functions when "the same EPA staff persons who performed the remedial investigation, considered the options and formed the feasibility study and selected the preferred remedy, also evaluated the comments and issues raised by other parties, including defendants.")

In the instant case, neither the enforcement attorneys, the delisting office, nor the delisting contractor are wearing "two hats". Although there is evidence that the enforcement attorneys have been in contact with the delisting contractor, the piecemeal evidence that Bethlehem has presented, by way of isolated sentences from internal memoranda, does not overcome the presumption of regularity in the delisting process to reach the conclusion that the delisting office is biased. Bethlehem had an opportunity to put on witnesses to further clarify this matter, and failed to do so. Further, this Court is not certain whether this a proper challenge in a penalty hearing for two reasons. First, as in *Bethlehem,* Bethlehem challenged the propriety of an administrative decision on its DCO, a final agency action. In this case, there has

---

4. Bethlehem alleged that EPA delayed in reaching its decision on the DCO in an effort to improve its position in its ongoing enforcement action, and the court was also concerned with

communication between enforcement attorneys and the administrator's office after the time had passed for public comment and after the enforcement action had been filed. *Id.* at 1010.

been no final agency action on its delisting petition. Since Bethlehem is attacking the propriety of the delisting process, a commingling defense would be more proper in attacking EPA's decision on the delisting petition itself, instead of as a defense in this penalty proceeding.

Second, this Court was unable to find, nor have the parties provided, any district court case or administrative case where a commingling defense was used to mitigate a defendant's penalty. Although there exists no statutory guidance for this Court to determine these factors in considering Bethlehem's penalty, the statute provides that the Administrator shall determine any good faith efforts and the seriousness of Bethlehem's violation in determining penalties. 42 U.S.C. § 6928(c). EPA has issued a RCRA civil penalty policy (May 8, 1984) in which the presiding officer, most likely an ALJ, must take into consideration the following five factors in determining whether a defendant's penalty should be adjusted upwards or downwards: 1) good faith efforts to comply/lack of good faith; 2) degrees of willfulness and/or negligence; 3) history of noncompliance; 4) ability to pay; and other unique factors. Although the EPA does not state exactly what it means by other remaining factors, other than when it refers to such as "specific to the violator or the case", see Environmental Protection Agency, Policy on Civil Penalties, 17 E.L.R. 35083 (Feb. 16, 1984), or "including strength of case, competing public policy concerns", see *Id.* at attachment A, it would appear that based on the EPA's laundry list, other unique factors would deal with *a defendant's* actions that either mitigate or increase a penalty, as opposed to any actions taken by or on behalf of the Government or EPA. In any event, regardless of whether Bethlehem is entitled to utilize its commingling defense, the Court has found that Bethlehem has not met its burden of proving any agency bias.

As for the amount of economic benefit that Bethlehem has reaped by its noncompliance, the Court finds that the Government's witness, Mr. Daniel W. Francke, is far more credible that Bethlehem's expert witness, Mr. Jasbinder Singh. Mr. Francke testified that Bethlehem received an economic benefit

of approximately $1,586,900 in failing to comply with the closure requirements for its landfill, and that the benefit attributable to delayed capping could be off by as much as 50% or more. Mr. Singh testified that he had not rendered his expert opinion on the economic benefit Bethlehem had reaped until after Mr. Francke had testified, and that any opinion he gave was based on the same model upon which Mr. Francke relied upon. Further, this Court finds Mr. Singh's opinion, that Bethlehem sustained a $1.4 million loss because it could have moved the landfill material off-site during a temporary exclusion for approximately $80,000, as borderline ludicrous because it is based on something that has never occurred—Bethlehem has never removed the material from its landfill and today the least costly means of complying with the closure requirements is to cap the landfill. Bethlehem simply does not have the option of moving its waste from the landfill to another site as the temporary exclusion has since expired. Because this option is no longer available to Bethlehem today, Bethlehem cannot in good faith assert that its $80,000 cost to move the material in the landfill is the lowest cost compliance option. Moreover, Mr. Singh testified that after the exclusion expired, Bethlehem would have sustained an economic benefit.

Based upon the above considerations, the Court hereby assesses a civil penalty against Bethlehem for its violations relating to the landfill in the amount of $1.8 million.

*CONCLUSION*

In accordance with the reasons set forth in this Order, the Court hereby ORDERS Bethlehem Steel Corporation to pay as civil penalties the sum of $6 million to the United States Treasury. This figure consists of $4.2 million for violation of its Corrective Action Permits and mitigating circumstances relating thereto, and the sum of $1.8 million for Bethlehem's violations relating to the landfill.